FARMERS STATE BANK OF MADELIA, INC. v. FRANK
BURNS AND ANOTHER.
CITY OF OWATONNA, APPELLANT.
NEW YORK CASUALTY COMPANY OF NEW YORK,
INTERVENER.[1]

May 22, 1942.

Nos. 32,994, 32,995.

[1]Reported in 4 N. W. (2d) 330, 5 N. W. (2d) 589.

*Helon E. Leach* and *Oppenheimer, Hodgson, Brown, Donnelly & Baer,* for appellant City of Owatonna.

*Wilson & Blethen* and *Arthur H. Ogle,* for intervener-appellant.

*Manahan & Perrier* and *Gallagher & Madden,* for plaintiff-respondent.

JULIUS J. OLSON, JUSTICE.

Defendant city of Owatonna and intervener, New York Casualty Company, separately appeal from orders denying their respective motions for amended findings or a new trial.

In April 1939, defendant Burns, as contractor, entered into an agreement with the village of Madelia for the construction of certain street improvements. He applied to intervener, hereafter referred to as the surety, for the bond required by Mason St. 1927, § 9700, and it duly executed his performance bond as surety. By the terms of his application for the bond, Burns agreed that the surety should "be subrogated to all the rights and properties of the *Indemnitor.*" (Italics supplied.) This also included deferred and reserved payments due him or to become due, whether earned under progress estimates or final payments. He also pledged "all moneys and securities that may be due and payable * * * on * * * any other contract of the Indemnitor * * * on which the Surety * * * may become surety." It is upon this instrument that the surety now rests its right of recovery, since it took a loss of something like $1,300 on that job.

In the performance of the Madelia contract, Burns from time to time secured from plaintiff funds with which to meet payments of laborers and materialmen. The $4,400 in the form of notes given plaintiff were credited to his account, and, Burns testified, "I used it for paying labor and material bills on the job." It is thus evident that to the extent represented by these obligations plaintiff is much more than a mere stranger, volunteer, or general creditor of Burns in these transactions.

On July 5, 1939, Burns took over a similar job for Owatonna, the earnings from which are presently involved. Under the terms thereof, Burns agreed to "furnish all of the material and perform all of the work" provided for by the contract. And the city agreed to "pay" him, upon progress estimates, "such sums as result from the following unit prices, and the actual quantities constructed, to the satisfaction of the Engineer." On July 14, Burns assigned this contract to plaintiff to secure the indebtedness incurred on the Madelia job and "any future advances" to be made thereafter. The assignment adequately identifies the Owatonna contract, and conclusively embodies the purpose and intent by both Burns and the bank that further funds were to be made

available in the performance of the Owatonna job. Thereby Owatonna was authorized and directed "to make payment of any and all money due or to become due" Burns thereunder to plaintiff, which was authorized to "receive and receipt" for such payments in the "place and stead" of Burns. The bank was appointed "his true and lawful attorney to sue for and recover and receive any and all sums due or to become due from the City." On July 18, Owatonna was properly notified of the assignment. In the performance of that job the bank financed Burns with additional sums, which were used by him at Owatonna in the same manner as he had theretofore employed on the Madelia job. Intervener is also surety on the Owatonna job.

No notice was given by the surety to Owatonna in respect to its claim under the application for bond in the Madelia deal until November 27, 1939, and "the city had no previous notice" of this claim. This took place after all the work had been finished, final estimate issued, and the job accepted. Owatonna still holds $1,082.96 earned by Burns under his contract, "which it is willing to pay to the rightful owner thereof."

For consideration and decision here there are, primarily, the conflicting claims between plaintiff and Owatonna (referred to hereafter as the "city"), Burns not being a party to this appeal. A recital of some additional facts is deemed appropriate.

Included in the contract by reference is a written instrument labeled "General Conditions." Paragraphs 13 and 15 thereof are important, and these provide (Plaintiff's exhibit 1, p. 6):

"13. CONTRACT SECURITY: The contractor shall furnish a surety bond * * * in an amount at least equal to 100 per cent of the contract price as security for the faithful performance of this contract and for the payment of all persons performing labor and furnishing materials in connection with this contract.

&ast; &ast; &ast; &ast; &ast;

"15. *Payment:* Not later than the 15th day of each calendar month *the city will make partial payment to the contractor on the*

*basis of a duly certified approved estimate of the work performed during the preceding calendar month by the contractor,* but the city will retain 10 per cent of the amount of each such estimate until final completion and acceptance of all work covered by this contract." (Italics supplied.)

The italicized portion contains the only condition as to when the "city will make" its payments except as to the retained percentage.

On September 1, 1939, Burns had so far proceeded in the performance of his job that progress estimate No. 1 was issued, which, after deducting the agreed retained percentage, entitled him to the payment of $4,095.79. A check for that amount was promptly issued, payable to him, but left in the possession of the city attorney. Plaintiff's demand for the check or its proceeds was refused upon the claim that there were some labor and material items to be paid. This dispute was adjusted, however, so that $2,316.19 thereof was left with the city attorney and used by him for that purpose. The remainder, $1,779.60, was turned over to plaintiff. The next estimate came in October 2, entitling Burns to $5,159.75, and in that amount the city again issued its check payable to Burns, but again the possession of the check was left with the city attorney. Plaintiff's demand for it or its proceeds was refused for the same reason as that assigned when the first payment was made. Without plaintiff's consent, in fact over its protest, but with the assistance of Burns, the check was then cashed and "nearly all" of its proceeds used by the city officers in payment of labor and material items going into the job. Estimates 3, 4, and 5 shared the same fate. So nothing of Burns's earnings reached plaintiff out of these estimates. Prior thereto, and until the October estimate came in, plaintiff had extended Burns's credits going into the job in an amount exceeding $5,000. Due to "the insistence of the mayor, and [upon] the advice of our city attorney," all checks were made payable to Burns but "were turned over to the city attorney" and the proceeds used in payment of

labor and material claims. Plaintiff's interests and rights were wholly ignored; consequently it refused thereafter to honor Burns's checks.

1. Plaintiff's cause is founded upon the principles of law laid down in the Waseca case (American Surety Co. v. Board of Co. Commrs. 77 Minn. 92, 79 N. W. 649) and other subsequent cases. These were the facts in that case: The contractor had agreed to build a courthouse for Waseca county. He was to be paid in installments of 85 per cent on monthly estimates of the cost of labor performed and materials furnished. The remaining 15 per cent was to be retained by the county until the building was completed. Plaintiff was the surety on his performance bond. The contractor failed to pay claims for work and labor performed and materials furnished. Of this fact the county board was duly notified by the surety and certain claimants, all of whom (77 Minn. 95, 79 N. W. 650) "objected to the payment" of the amount then due the contractor under a progress estimate, "unless it should be paid to laborers or materialmen." But the "board disregarded the objections" and later, on order of the contractor, paid $1,500 to "one of his general creditors." The county paid no part of the withheld percentage. The contractor later "abandoned his contract, and the building was completed by another party." Plaintiff then, as surety, "paid and satisfied all legal claims for which it was bound on its bond" and brought suit to recover the amount paid by the board after notice of the contractor's default. Upon these facts and on defendants' motion, the court dismissed the action upon the theory that the amount paid by the county belonged to the contractor. The issue presented by the appeal was whether the surety could recover from the county in that situation.

In that case, as in this, the performance bond provided that the contractor should "pay all just claims for work and labor performed and material furnished in and about the performance of his contract as they became due." And in that case, as in this, the surety's claim was based upon the theory that the county

board had the right, and was in duty bound, when it received notice of the contractor's default, to see to it that the money earned on the job should go to laborers and materialmen, thereby reducing the surety's loss. It sought equitable relief because, as to laborers and materialmen, to whose rights and remedies it had succeeded, the county stood in the position of a *quasi* trustee. This court in disposing of plaintiff's claim said (77 Minn. 96, 97, 79 N. W. 650:

"The parties for whose benefit and protection the obligation is entered into are as independent of each other, under this law, as if separate bonds had been required and had been given. * * * In complying with the terms of the written contract, the county was fully protected by the bond, for the laborers and materialmen could obtain no lien rights as against it." The opinion recognized "that a creditor or an obligee upon a bond must deal fairly with the surety," but that "he cannot be held to have dealt unfairly, if he has simply complied with the terms of his contract, and has been powerless to do otherwise. The defendant board had no authority under the statute to enforce the contractor's duty towards the laborers and materialmen by withholding payment on the estimates, and consequently it neglected no duty it owed to plaintiff surety."

In later cases this court has cited the Waseca case with approval and applied the doctrine announced therein. See Wilcox Lbr. Co. v. School Dist. 103 Minn. 43, 44, 114 N. W. 262; George A. Hormel & Co. v. American Bonding Co. 112 Minn. 288, 297, 128 N. W. 12, 33 L.R.A.(N.S.) 513. So, also, in New Amsterdam Cas. Co. v. Wurtz, 145 Minn. 438, 444, 177 N. W. 664, the same question arose and the same result was reached, the Waseca case being cited as authority for decision.

There are other cases sustaining that view, although the Waseca case is not cited. Among them is Peet v. City of East Grand Forks, 101 Minn. 518, 112 N. W. 1003, where the city had failed to pay installments on progress estimates, the holding being that

such failure justified the contractor in abandoning his contract and entitled his assignee to recover the value of the work actually performed. In Standard Oil Co. v. Day, 161 Minn. 281, 285, 286, 201 N. W. 410, 412, 41 A. L. R. 1291, where, as here, it was claimed the surety had a right to the contractor's earnings to the extent needed to pay labor and material going into the construction, the court said:

"*Our public contractor's bond contemplates that the contractor will receive and disburse his money as suits his convenience.* * * * Where the bond is furnished the surety must recognize the possible occurrence of what here did occur as one of the perils of its business. In other words one who becomes surety takes the risk that honest payment of unsecured debts may leave a deficiency which the surety must make good." (Italics supplied.)

The opinion recognizes that "there are authorities that do not support our holding." But, after reviewing them, we adhered to our former decisions, saying (161 Minn. 287, 201 N. W. 412, 41 A. L. R. 1291):

"The surety in modern business should be, and usually is, quite able to care for itself. It selects those for whom it becomes surety. Most contractors and subcontractors must necessarily use some of their money that they receive in payment of obligations not incurred in the particular contract from which their money is received."

The conclusion reached was that where a third party in good faith receives such funds, the same are not "impressed with an equity in favor of the surety." In Standard Oil Co. v. Remer, 167 Minn. 352, 209 N. W. 315, the holding was that the equity of a bank which finances a contractor in the construction of a road under an agreement whereby it is to make advances and the contractor is to pay to it money received from the contract is superior, in respect to a balance remaining in the hands of the county upon the completion of the contract, to that of the surety on the contractor's bond, although such contractor agreed in his application

for the bond that upon default any sum remaining in the hands of the county, upon completion of the contract, should be considered as assigned to his surety.

2. In Gilloley v. Sampson, 203 Minn. 233, 242, 281 N. W. 3, 7, the distinction is pointed out between cases "requiring performance of a covenant * * * before the contractor shall be entitled to receive payment" (cf. National Exch. Bank v. Solberg, 175 Minn. 436, 221 N. W. 677, and Johnson v. Laurence, 171 Minn. 202, 214 N. W. 24) and *"in which the contractor agreed, as part of the contract, to pay for labor and material before he was to receive payment from his employer,"* and the other class of cases where "nonperformance of an independent covenant merely raises a cause of action for its breach and does not constitute a bar to the right of the party making it to recover for breach of the promise made to him. O'Brien v. Liberty Mining Co. * * * 164 Minn. [186], 190, 204 N. W. 625; Noyes v. Brown [142 Minn. 211, 171 N. W. 803]." (Italics supplied.)

3. The facts in this case clearly bring it within the latter rule. Here the giving of the statutory performance bond was but a condition to be met by the contractor before his contract with the city would become effective. It was in the same category as "Compensation Insurance" and "Public Liability and Property Damage Insurance," provided for in paragraph 14 of the "General Conditions." As such, the breach of an "independent undertaking rests 'in covenant merely' and affords, to the promisee, 'no ground for avoiding the contract.'" O'Brien v. Liberty Min. Co. 164 Minn. 186, 190, 204 N. W. 625, 626.

4. As pointed out in 6 Dunnell, Dig. & Supp. §§ 9107a and 9107c, those who write surety bonds are, generally speaking, regarded as underwriters of contracts of insurance. They are not favored by the law. They are experts in the business of appraising risks. With these fundamental principles in mind and applying the rule of law announced in the Waseca case to the facts here, it seems clear that the trial court rightly decided this case and that its findings in the premises should be sustained.

464

5. There remains only the question of whether Barrett Bros. Co. v. County of St. Louis, 165 Minn. 158, 161, 206 N. W. 49, 50, has so limited the rule stated in the Waseca case as to destroy it. It is well that we review the facts in that case and compare them with those here presented. There plaintiff, a wholesale grocer, furnished the contractor a large quantity of provisions to be used in connection with the performance of several of the contractor's jobs. The items going into the deal were not even claimed by plaintiff to be protected by the contractor's statutory performance bond. The only question there raised was whether the earnings of the contractor, assigned to plaintiff, beyond "the reserved percentage," could be reached under plaintiff's assignment. Plaintiff conceded that the reserved percentage could not be reached. The holding was that plaintiff as assignee, "having no independent equity," had no "right superior to that of the surety," since the fund sought to be reached "was no part of the prospective earnings, whether reserved or unreserved, which the contractor could assign to a mere stranger such as plaintiff." There is also this distinction between that case and this: There the surety did perform the obligation of its principal by paying all claims of laborers and materialmen. That was the basic reason for the holding that in virtue thereof plaintiff became subrogated to their rights. Nowhere in that opinion is any question raised as to the validity and continued effectiveness of the Waseca case. On the contrary, as a matter of fact, the Wurtz case (145 Minn. 438, 177 N. W. 664) was there cited (165 Minn. 163, 206 N. W. 51) and the Waseca case was cited and relied upon in the Wurtz case as stating a settled doctrine (145 Minn. 444, 177 N. W. 666).

The city, pursuant to its contract and the statute, having required Burns to furnish the security provided thereby to protect all laborers and materialmen, discharged its full duty. Its officers were not trustees (American Surety Co. v. Board of Co. Commrs. 77 Minn. 92, 96, 79 N. W. 649, 650) "for the purpose of enforcing a liability accruing" to them "through the delinquency of the contractor." Nor is there any authority granted by the

statute (§ 9700) authorizing the city to enforce "as between the latter and the contractor" any such claims. By complying with its contract, the city "was fully protected by the bond." It had (77 Minn. 97, 79 N. W. 650) "no authority under the statute to enforce the contractor's duty towards the laborers and materialmen by withholding payment on the estimates." By its conduct it has attempted, unsuccessfully, "to cast the burden upon the obligees in the bond, instead of upon the obligors." After notice of the assignment of the contract to plaintiff, the city diverted the funds realized thereunder. And since (Dickson v. City of St. Paul, 97 Minn. 258, 260, 106 N. W. 1053, 1054) "we can discover no good reason why he [Burns] was not legally competent to sell or assign the claims he had against the city for money due or to become due as the performance of the contracts progressed," its responsibility to plaintiff seems firmly established.

There are other sound reasons, too, why we should adhere to that rule. Obviously, when contracts of this nature are in the process of performance, conflicts between laborers, materialmen, subcontractors, and the principal contractor are likely to arise in many instances. Men may be hired and fired from day to day, material furnished on the job may not prove suitable. There may be long and tedious delays from many causes. If a public body is to conduct its contractual affairs in the manner here exercised by the city, many unexpected and unfortunate difficulties are bound to arise. All these may be avoided by strict compliance with the contract and the statute. Many such contracts involve enormous sums of money. As a practical matter, in the performance of them, it is quite impossible for municipal officers to hear and determine the conflicting claims likely to arise. No such authority has been granted by the contract here involved; the statute does not so authorize; and, under the plain requirements of the statute and the performance contract between the contractor and the city, the rights and remedies between the contractor and those with whom he alone deals should be left with them, where they belong.

While there are cases from other jurisdictions "that do not support our holding" (Standard Oil Co. v. Day, 161 Minn. 281, 286, 201 N. W. 410, 412, 41 A. L. R. 1291, *supra*) these, while valuable, are not controlling. We took a definite stand in the Waseca case. There the same arguments were made for the surety as those here presented by the city and the present surety. The arguments urged in appellant's brief in that case bear a striking resemblance to those renewed here. With such distinguished jurists as Chief Justice Start and Justice Mitchell taking part and concurring in that opinion, we hesitate to overturn what they deliberately decided. That case has stood the test of time. The statute there construed and applied is in substance the one we now have. That case has virtually become a part of our law on the subject of the bond required by § 9700.

Having thus disposed of the principal issues as between plaintiff and the city, no further argument is needed to sustain the trial court's holding "that intervener is not entitled to any remedy or relief herein."

Both orders are affirmed.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.

MR. JUSTICE STONE dissents and on account of illness reserves the reasons for his dissent for later expression.

---

The following dissenting opinion, prepared by Mr. Justice Stone prior to his death September 13, 1942, was filed by the court September 29, 1942, pursuant to the reservation appended to the majority opinion filed May 22, 1942.

STONE, JUSTICE (dissenting).

Under any circumstances I would be grateful to my considerate associates for the leave they have given me to express this belated dissent. I am especially so now because my disagreement is persuasive and fundamental. That is the main reason why this expression of it is lengthy. Another and incidental reason is that in

large part what I say was originally submitted in the vain hope that it would express the nearly unanimous view of the court.

The problem is important. It is one of those which will frequently recur and assuredly will never be settled until it is settled rightly.

Drawn across the trail of consideration is the distracting irrelevancy which is the subject matter of subdivision 4 of syllabus and opinion. Of course, the surety here is an insurer. But the case involves no question concerning interpretation of its bond. Neither is there denial that it is entitled to all conventional rights of a surety. So, jurors absent, comment about its not being "favored by the law" is just wide of the mark.

It is asserted by Mr. Justice Olson that the assignment from Burns to plaintiff "conclusively embodies the purpose and intent by both Burns and the bank [plaintiff] that further funds were to be made available in the performance of the Owatonna job."

That declaration is literally true and as deceptive as true. That is because it is only half the truth. The other and more important half is that the assignment did not impose upon the plaintiff, as assignee, any obligation to advance additional funds to Burns. That being so, plaintiff, as assignee of Burns, had the status and rights of a volunteer, nothing more. That is decisive, or should be, of this case.

Burns hoped for, and the bank made, further advances. What of it? The plain fact is that the bank was under no legal or contractual obligation to advance another cent to Burns to finance the Owatonna contract or any other.

There is not a single word in the assignment imposing any such obligation on the bank. Nor is there a word therein imposing upon Burns the obligation to use additional advancements, if any, in performing the Owatonna contract.

Burns was expressly (not impliedly) obligated to "pay all just claims for work and labor performed and material furnished * * * as they became due." With such primary obligation upon the contractor, the case should go to decision upon the rule of

the St. Louis County case (Barrett Bros. Co. v. County of St. Louis, 165 Minn. 158, 206 N. W. 49). That rule is one of subrogation and is that the right of a building contractor's surety as subrogee takes effect as of the date of the suretyship. McArthur v. Martin, 23 Minn. 74 (78) ;[2] National Surety Co. v. Berggren, 126 Minn. 188, 148 N. W. 55.

As against both city and surety, plaintiff was a volunteer. It was under no obligation to lend money to Burns. In such cases, the surety is not a volunteer and has an equity which takes hold as of the date of the suretyship. But an assignee, such as plaintiff, whose advances to the contractor were made under no compulsion of law or contract, is a mere volunteer.[3] Henningsen v. U. S. F. & G. Co. 208 U. S. 404, 28 S. Ct. 389, 52 L. ed. 547, followed in Barrett Bros. Co. v. St. Louis, *supra*.

Burns was in default, threatening early interruption, if not complete cessation, of his work. Seriously and continually he had breached his promise to pay labor, material, and equipment rental claims as they fell due. All else aside, the superior equity of the surety required that to be done which was done, that is, that those claims be paid out of the fund resulting from their joint contributions. (Only $33 of the city's money was not paid on such claims. That much, and no more, was paid either to Burns or for banking service.)

Another aid to orientation of approach is the rule that, save as he is helped by some equity of his own or hindered by the

[2]In that case the rule was stated thus: "The right of subrogation and the equitable assignment relate to the date of the suretyship, as against the principal and those claiming under him."

[3]In contrast is New Amsterdam Cas. Co. v. Wurtz, 145 Minn. 438, 177 N. W. 664, 665. It was held that the assignee of a contractor who made loans to the latter (the proceeds of which went into the work), under an affirmative contractual obligation to make such advances, was not a volunteer. In that connection, this quotation was made from Wasco Co. v. New England Equitable Ins. Co. 88 Or. 465, 476, 172 P. 126, L. R. A. 1918D, 732, Ann. Cas. 1918E, 656: "the contractor can neither supplant this equity [the surety's] nor strip it of its priority by borrowing money from some person not obliged to lend and assigning the funds to secure the loan."

equity of another, the assignee of a nonnegotiable chose in action, such as plaintiff, occupies the "exact position" of the assignor. Brown v. Equitable L. A. Society, 75 Minn. 412, 78 N. W. 103, 671, 79 N. W. 968. So, equities aside, plaintiff had no greater rights than Burns would have had if there had been no assignment. In default in respect to payment for material and labor, Burns could not have insisted that progress payments should not go to laborers and materialmen, who, as beneficiaries of the contract, were entitled to them. Inasmuch as he could not have done that, plaintiff, as his assignee, could not have done it.

As between plaintiff and surety, the question is one of priority. The fund involved was earned under the contract. Principal contributors to it were those who did the work and furnished the material essential to performance. Had the surety, on default of Burns, paid such claims, it would have been subrogated to the rights of the creditor laborers and materialmen. It would have stepped into their place as owner of the superior equity which by automatic relation had hold of the building fund from the date of the suretyship.

That was but recognized by the city. It did just what equity required. Notwithstanding, the decision requires the city to pay again to plaintiff, as volunteer and general creditor of Burns, whose equity, in point of time and substance, is subordinate to the legal claims of laborers and materialmen and the surety's equity.

We need not consider whether the covenants of Burns to pay for labor and material and of the city to make progress payments were dependent upon or independent of each other. (See Gilloley v. Sampson, 203 Minn. 233, 281 N. W. 3, wherein was involved no right of a surety.) Assuming that the covenants were independent as to performance, the decisive fact remains that, in seeing to the payment of laborers and materialmen, the city but complied with the plain equity of the situation in discharging a contractual obligation of Burns, the performance of which had been guaranteed by the surety. So I see nothing of law or equity

to compel a second payment to plaintiff. The latter's legal and equitable status is inferior to that of the laborers and material-men paid by the city, and also that of the surety.

Even though the promises of Burns to pay for labor and material and of the city to make progress payments are assumed to be independent one of the other, Burns was in default whenever he failed to pay such claims as they became due. As against such claims, the city, having notice of the default of Burns, was under plain duty not to divert any of the building fund (consisting of the earnings of Burns) to such extraneous purposes as the payment of a general creditor of Burns claiming under an assignment.

That precisely was the issue in Joint School Dist. v. Bailey-Marsh Co. 181 Wis. 202, 194 N. W. 171. There, while the contractor was in default in respect to furnishing material, the plaintiff had paid to a bank a $5,000 order given by the contractor against the building fund. Because of its diversion of that much of the fund from the purpose to which in equity it was devoted, the city, although it was allowed judgment against the defaulting contractor for the full amount of its claim, on appeal had its judgment against the contractor's surety reduced in the amount of the $5,000 so diverted from the purpose to which the surety had the equitable right to have it devoted, that is, performance of the contract. That decision was compelled because, as the court said (181 Wis. 211):

"It is well settled that whenever a creditor [whose claim has been underwritten by a surety] has a right and opportunity to apply property of the principal to the satisfaction or security of his debt, he owes to the surety a duty to do so, and release or waiver of that right to the prejudice of the surety and without his consent will discharge the surety, at least *pro tanto*. * * * the plaintiff had no right, by the acceptance and payment of the order [in favor of a general creditor of the contractor] * * * to divert any part of the contract fund to the payment of a general obligation of the company [contractor] without the consent of the

surety. It is immaterial that all or some part of the money loaned by the bank to the company [contractor] upon its note was used by the company for paying off the claims of laborers or materialmen."[4]

Nothing further by way of either reason or authority seems needed to support the thesis that in the case of a public building contract, with a performance bond collateral thereto, or, as here, part thereof, the earnings of the contractor constitute a fund in which the surety has plain equitable rights. Those equities are superior to the rights of a general creditor of the contractor. It follows that, in this case, when the city, on the contractor's default therein, paid labor and material claims out of the building fund, it was doing precisely what equity demanded. Hence it ought not to be compelled by judgment to duplicate the payment.

It is futile to attempt reconciliation of the Waseca case, 77 Minn. 92, 79 N. W. 649, with the St. Louis County case. (The latter was not brought to the attention of the trial judge.) In the Waseca case (where the contractor was in default under his obligation to pay for labor and material and the county, as obligee, was notified thereof by the surety), the reasoning was, in main part, that, "while it is the law that a creditor or an obligee upon a bond must deal fairly with a surety, he cannot be held to have dealt unfairly if he has simply complied with the terms of his contract, and has been powerless to do otherwise. The defendant board had no authority under the statute to enforce the contractor's duty towards the laborers and materialmen by withholding payment on the estimates, and consequently it neglected no duty it owed to plaintiff surety."

That is wrong in two respects. First, the obligee is not "powerless to do otherwise" than pay contractor or his assignee, ignoring the former's default. He may usually, if not always, when payment is due and there is default, see to it that his money is used

---

[4]That conclusion was based as to authority upon Henningsen v. U. S. F. & G. Co. 208 U. S. 404, 28 S. Ct. 389, 52 L. ed. 547, the rule of which we endeavored to interpret and apply in the St. Louis County case.

to pay overdue claims for labor and material. (In the instant case, the city did not refuse to make the progress payments. It made them, but, with coöperation of the contractor, saw to it that the money went in discharge of outstanding claims for labor and material.) Second, the Waseca decision inadvertently ignored the priority of the surety's equity over that of any mere general creditor or volunteer assignee of the contractor.[5] Insofar, therefore, as that decision runs counter to the St. Louis County case, it should be overruled. It's error plain and fundamental; there is nothing in the doctrine of *stare decisis* to require us to perpetuate it.

At the time of decision in the Waseca case (1899), the rights of parties, beneficiaries of a contract but not parties thereto, were limited by the rule of Jefferson v. Asch, 53 Minn. 446, 55 N. W. 604, 25 L. R. A. 257, 39 A. S. R. 618. That rule has been much modified. (La Mourea v. Rhude, 209 Minn. 53, 295 N. W. 304; Restatement, Contracts, §§ 133-147.) Now, either donee or creditor beneficiary is entitled to a cause of action *on the contract* upon default in performance. So, when the money of the city went to laborers and materialmen, the payment was to those entitled thereto under contract and bond. The evolution of law, in belated recognition of beneficiaries of a contract, has come since the Waseca case was decided. It illustrates the fact that the common law is not a matured, rigid, and inert mass. It is rather a live and growing organism, self-adapting to new problems and new truths. While avowing respect for precedent, it owes no allegiance either to ancient error or any concept invalidated by progress.

There can be no claim that by unilateral act of the promisor, such as an assignment, the right of the beneficiary can be defeated. Restatement, Contracts, §§ 142, 143. For example, the right of the beneficiary of a single-premium life insurance policy, wherein no

[5]"The decisions * * * recognize the right of a surety to have a payment made from funds in which it has an equity applied to the debt for which it is surety, and where the amount paid * * * is the identical sum * * * for the security of which the surety has bound himself, the surety is equitably entitled to have the money * * * given in satisfaction of the debt applied thereto." 21 R. C. L. 1128.

right of revocation has been reserved, cannot be defeated by the unilateral act of either insurer or insured. The right of the beneficiary, fixed by the contract and matured by death of the insured, would take precedence over any assignment made by the latter during his lifetime. So, the rights of laborers and materialmen to payment as due were in no wise affected by Burns's assignment to plaintiff. In this case the equitable rights of the surety coöperated with the legal rights of the laborers and materialmen to make proper, if not compulsory, the payments to the latter.

In result, this decision allows a stranger assignee, coming into the matter as a mere volunteer, to displace the prior equity of surety and defeat the legal rights of the creditor beneficiaries of the contract. For that anomalous result no reasonable justification is assigned, and in my judgment none is possible. Their almost daily regurgitation of the contents of precedent should enable judges to detect and eject the poison of error. That of the Waseca case is so plain and substantial as to explain the reticence of Mr. Justice Olson in respect to the citation of supporting authority.

I think there should be a reversal as against the plaintiff. I cannot agree that the decision for plaintiff, without more, disposes of the case as against the intervener. If as to the intervener the result is correct, it is for reasons other than those so scantily mentioned in the opinion.

