## PEARLMAN, TRUSTEE IN BANKRUPTCY, *v.*
## RELIANCE INSURANCE CO.

No. 78.   Argued October 9–10, 1962.—
Decided December 3, 1962.

*Raymond T. Miles* argued the cause for petitioner. With him on the briefs was *Lowell Grosse.*

*Mark N. Turner* argued the cause and filed briefs for respondent.

*John G. Street, Jr.* and *Edward M. Murphy* filed briefs as *amici curiae,* urging reversal.

*David Morgulas* filed a brief for the Association of Casualty & Surety Companies, as *amicus curiae,* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

This is a dispute between the trustee in bankruptcy of a government contractor and the contractor's payment bond surety over which has the superior right and title to a fund withheld by the Government out of earnings due the contractor.

The petitioner, Pearlman, is trustee of the bankrupt estate of the Dutcher Construction Corporation, which in April 1955 entered into a contract with the United States to do work on the Government's St. Lawrence Seaway project. At the same time the respondent, Reliance Insurance Company,[1] executed two surety bonds required of the contractor by the Miller Act, one to guarantee performance of the contract, the other to guarantee payment to all persons supplying labor and material for the project.[2] Under the terms of the contract, which was attached to and made a part of the payment bond, the United States

---

[1] The company was then known as Fire Association of Philadelphia.

[2] 40 U. S. C. § 270a provides in part as follows:

"(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as 'contractor':

"(1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in such amount as he shall deem adequate, for the protection of the United States.

"(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person."

was authorized to retain and hold a percentage of estimated amounts due monthly until final completion and acceptance of all work covered by the contract. Before completion Dutcher had financial trouble and the United States terminated its contract by agreement. Another contractor completed the job, which was finally accepted by the Government. At this time there was left in the Government's withheld fund $87,737.35, which would have been due to be paid to Dutcher had it carried out its obligation to pay its laborers and materialmen. Since it had not met this obligation, its surety had been compelled to pay about $350,000 to discharge debts of the contractor for labor and materials. In this situation the Government was holding over $87,000 which plainly belonged to someone else, and the fund was turned over to the bankrupt's trustee, who held it on the assumption that it had been property of the bankrupt at the time of adjudication and therefore had vested in the trustee "by operation of law" under § 70 of the Bankruptcy Act.[3] The surety then filed a petition in the District Court denying that the fund had vested in the trustee, alleging that it, the surety, was "the owner of said sum" of $87,737.35 "free and clear of the claims of the Trustee in Bankruptcy or any other person, firm or corporation," and seeking an order directing the trustee to pay over the fund to the surety forthwith.[4] The referee in bankruptcy, relying chiefly on this Court's opinion in *United States* v. *Munsey Trust Co.*, 332 U. S. 234 (1947), held that the surety had no superior rights in the fund, refused to direct payment to the surety, and

---

[3] 30 Stat. 565 (1898), 11 U. S. C. § 110.

[4] The surety appears also to have claimed some general priority over all creditors for the entire $350,000 it had paid out for the contractor, based on "liens, subrogation and assignment," but here its petition for certiorari and briefs seem to limit its claim to the net amount of the retained fund turned over to the trustee by the Government.

accordingly ordered the surety's claim to be allowed as that of a general creditor only to share on an equality with the general run of unsecured creditors.[5] The District Court vacated the referee's order and held that cases decided prior to *Munsey* had established the right of a surety under circumstances like this to be accorded priority over general creditors and that *Munsey* had not changed that rule.[6] The Second Circuit affirmed.[7] Other federal courts have reached a contrary result,[8] and as the question is an important and recurring one, we granted certiorari to decide it.[9]

One argument against the surety's claim is that this controversy is governed entirely by the Bankruptcy Act and that § 64, 11 U. S. C. § 104, which prescribes priorities for different classes of creditors, gives no priority to a surety's claim for reimbursement. But the present dispute—who has the property interests in the fund, and how much—is not so simply solved. Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankrupt's estate is quite another. Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. The Bankruptcy Act simply does not authorize a trustee to distribute other peo-

---

[5] 35 J. N. A. Ref. Bankr. 81 (1961).

[6] *In re Dutcher Constr. Corp.*, 197 F. Supp. 441 (D. C. W. D. N. Y. 1961).

[7] 298 F. 2d 655 (C. A. 2d Cir. 1962).

[8] See, *e. g., American Sur. Co.* v. *Hinds,* 260 F. 2d 366 (C. A. 10th Cir. 1958); *Phoenix Indem. Co.* v. *Earle,* 218 F. 2d 645 (C. A. 9th Cir. 1955).

[9] 369 U. S. 847 (1962).

ple's property among a bankrupt's creditors.[10]   So here if the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt.   This Court has recently reaffirmed that such property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.[11]   Consequently our question is not who was entitled to priority in distributions under § 64, but whether the surety had, as it claimed, ownership of, an equitable lien on, or a prior right to this fund before bankruptcy adjudication.

Since there is no statute which expressly declares that a surety does acquire a property interest in a fund like this under the circumstances here, we must seek an answer in prior judicial decisions.   Some of the relevant factors in determining the question are beyond dispute.   Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise such as the surety here had.[12]   And probably there are few doctrines better established

---

[10] See Justice Holmes' discussion in *Sexton* v. *Kessler & Co.*, 225 U. S. 90, 98–99 (1912).   As to the difficulties inherent in phrases like "equitable lien," see Glenn, The "Equitable Pledge", Creditors' Rights, and the Chandler Act, 25 Va. L. Rev. 422, 423 (1939).

[11] *United States* v. *Durham Lumber Co.*, 363 U. S. 522 (1960). See also *Security Mortgage Co.* v. *Powers*, 278 U. S. 149 (1928), and cases collected in 6 Am. Jur., Bankruptcy, § 949 (rev. ed. 1950).   Cf. *Aquilino* v. *United States*, 363 U. S. 509 (1960).

[12] "The right of subrogation is not founded on contract.   It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." *Memphis & L. R. R. Co.* v. *Dow*, 120 U. S. 287, 301–302 (1887).

than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.[13]   This rule, widely applied in this country [14] and generally known as the right of subrogation, was relied on by the Court of Appeals in this case.   It seems rather plain that at least two prior decisions of this Court have held that there is a security interest in a withheld fund like this to which the surety is subrogated, unless, as is argued, the rule laid down in those cases has been changed by passage of the Miller Act or by our holding in the *Munsey* case.   Those two cases are *Prairie State Bank* v. *United States,* 164 U. S. 227 (1896), and *Henningsen* v. *United States Fid. & Guar. Co.,* 208 U. S. 404 (1908).

In the *Prairie Bank* case a surety who had been compelled to complete a government contract upon the contractor's default in performance claimed that he was entitled to be reimbursed for his expenditure out of a fund that arose from the Government's retention of 10% of the estimated value of the work done under the terms of the contract between the original contractor and the Government.   That contract contained almost the same provisions for retention of the fund as the contract presently before us.   The Prairie Bank, contesting the surety's claim, asserted that it had a superior equitable lien arising from moneys advanced by the bank to the contractor before the surety began to complete the work.   The Court, in a well-reasoned opinion by Mr. Justice White, held that this fund materially tended to protect the surety,

---

[13] See, *e. g., Hampton* v. *Phipps,* 108 U. S. 260, 263 (1883); *Lidderdale's Executors* v. *Robinson's Executor,* 12 Wheat. 594 (1827); *Duncan, Fox, & Co.* v. *North and South Wales Bank,* 6 App. Cas. 1 (H. L. 1880).   See generally Sheldon, Subrogation, § 11 (1882).

[14] See cases collected in 50 Am. Jur., Subrogation, § 49 (1944).

that its creation raised an equity in the surety's favor, that the United States was entitled to protect itself out of the fund, and that the surety, by asserting the right of subrogation, could protect itself by resort to the same securities and same remedies which had been available to the United States for its protection against the contractor. The Court then went on to quote with obvious approval this statement from a state case:

"The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed. And there is great justness in the rule adopted. Equitably, therefore, the sureties in such cases are entitled to have the sum agreed upon held as a fund out of which they may be indemnified, and if the principal releases it without their consent it discharges them from their undertaking." 164 U. S., at 239, quoting from *Finney* v. *Condon,* 86 Ill. 78, 81 (1877).

The *Prairie Bank* case thus followed an already established doctrine that a surety who completes a contract has an "equitable right" to indemnification out of a retained fund such as the one claimed by the surety in the present case. The only difference in the two cases is that here the surety incurred his losses by paying debts for the contractor rather than by finishing the contract.

The *Henningsen* case, decided 12 years later in 1908, carried the *Prairie Bank* case still closer to ours. Henningsen had contracts with the United States to construct public buildings. His surety stipulated not only that the contractor would perform and construct the buildings, but also, as stated by the Court, that he would "pay promptly

and in full all persons supplying labor and material in the prosecution of the work contracted for." [15] Henningsen completed the buildings according to contract but failed to pay his laborers and materialmen. The surety paid. This Court applied the equitable principles declared in the *Prairie Bank* case so as to entitle the surety to the same equitable claim to the retained fund that the surety in the *Prairie Bank* case was held to have. Thus the same equitable rules as to subrogation and property interests in a retained fund were held to exist whether a surety completes a contract or whether, though not called upon to complete the contract, it pays the laborers and materialmen. These two cases therefore, together with other cases that have followed them,[16] establish the surety's right to subrogation in such a fund whether its bond be for performance or payment. Unless this rule has been changed, the surety here has a right to this retained fund.

It is argued that the Miller Act [17] changed the law as declared in the *Prairie Bank* and *Henningsen* cases. We think not. Certainly no language of the Act does, and we have been pointed to no legislative history that indicates such a purpose. The suggestion is, however, that a congressional purpose to repudiate the equitable doctrine of the two cases should be implied from the fact that the Miller Act required a public contract surety to execute two bonds instead of the one formerly required. It is true that the Miller Act did require both a performance

---

[15] 208 U. S., at 410.

[16] See, *e. g., Martin* v. *National Sur. Co.*, 85 F. 2d 135 (C. A. 8th Cir. 1936), aff'd, 300 U. S. 588 (1937); *In re Scofield Co.*, 215 F. 45 (C. A. 2d Cir. 1914); *National Sur. Corp.* v. *United States*, 132 Ct. Cl. 724, 133 F. Supp. 381, cert. denied *sub nom. First Nat. Bank* v. *United States*, 350 U. S. 902 (1955).

[17] See note 2, *supra*.

bond and an additional payment bond, that is, one to assure completion of the contract and one to assure payments by the contractor for materials and labor. But the prior Acts on this subject, while requiring only one bond, made it cover both performance and payment.[18] Neither this slight difference in the new and the old Acts nor any other argument presented persuades us that Congress in passing the Miller Act intended to repudiate equitable principles so deeply imbedded in our commercial practices, our economy, and our law as those spelled out in the *Prairie Bank* and *Henningsen* cases.[19]

The final argument is that the *Prairie Bank* and *Henningsen* cases were in effect overruled by our holding and opinion in *United States* v. *Munsey Trust Co., supra.* The point at issue in that case was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we held. The opinion contained statements which some have interpreted [20] as meaning that we were abandoning the established legal and equitable principles of the *Prairie Bank* and *Henningsen* cases under which sureties can indemnify themselves against losses. But the equitable rights of a surety declared in the *Prairie Bank* case as to sureties who com-

---

[18] 28 Stat. 278 (1894), amended, 33 Stat. 811 (1905).

[19] Among the problems which would be raised by a contrary result would be the unsettling of the usual view, grounded in commercial practice, that suretyship is not insurance. This distinction is discussed in Cushman, Surety Bonds on Public and Private Construction Projects, 46 A. B. A. J. 649, 652–653 (1960).

[20] See note 8, *supra.*

plete the performance of a contract were expressly recognized and approved in *Munsey*,[21] and the *Henningsen* rule as to sureties who had not completed the contract but had paid laborers was not mentioned. *Henningsen* was not even cited in the *Munsey* opinion. We hold that *Munsey* left the rule in *Prairie Bank* and *Henningsen* undisturbed. We cannot say that such a firmly established rule was so casually overruled.[22]

We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.[23] Consequently, since the surety in this case has paid

---

[21] 332 U. S., at 240.

[22] State courts likewise apply the rule that sureties on public contracts are entitled to the benefits of subrogation. See cases collected in 43 Am. Jur., Public Works and Contracts, § 197 (1942).

[23] See the somewhat different but closely related discussion by which Mr. Justice Cardozo, speaking for this Court, reached a similar result in *Martin* v. *National Sur. Co.*, 300 U. S. 588, 597–598 (1937).

Our result has also been reached by the Court of Claims in cases substantially like ours. *Continental Cas. Co.* v. *United States,* 145 Ct. Cl. 99, 169 F. Supp. 945 (1959); *National Sur. Corp.* v. *United States,* 132 Ct. Cl. 724, 133 F. Supp. 381, cert. denied *sub nom. First Nat. Bank* v. *United States,* 350 U. S. 902 (1955); *Royal Indem. Co.* v. *United States,* 117 Ct. Cl. 736, 93 F. Supp. 891 (1950). See generally Speidel, "Stakeholder" Payments Under Federal Construction Contracts: Payment Bond Surety vs. Assignee, 47 Va. L. Rev. 640, 646–648 (1961); note, Reconsideration of Subrogative Rights of the Miller Act Payment Bond Surety, 71 Yale L. J. 1274 (1962); comment, 33 Cornell L. Q. 443 (1948).

out more than the amount of the existing fund, it has a right to all of it. On this basis the judgment of the Court of Appeals is

*Affirmed.*

Mr. Justice White dissents.

Mr. Justice Clark, with whom Mr. Justice Douglas and Mr. Justice Brennan join, concurring in the result.

The Court holds that the surety company here is entitled to the funds the Government has paid into court on the theory that the surety is subrogated to the claims of the laborers and materialmen which it has paid. I cannot agree. None of the cases in this Court so hold. Indeed, in *United States* v. *Munsey Trust Co.,* 332 U. S. 234 (1947), this Court said:

> "But nothing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their compensation. . . . They cannot acquire a lien on public buildings . . . and as a substitute for that more customary protection, the various statutes were passed which require that a surety guarantee their payment. Of these, the last and the one now in force is the Miller Act under which the bonds here were drawn." *Id.,* at p. 241.
>
> "[I]t is elementary that one cannot acquire by subrogation what another whose rights he claims did not have. . . ." *Id.,* at p. 242.

Since the laborers and materialmen have no right against the funds, it follows as clear as rain that the surety could have none. It appears to me that today's holding that laborers and materialmen had "rights" to funds in the Government's hands might jeopardize the rights of the United States and have serious consequences for its building operations. The Congress has not so provided and I would not so hold.

However, this Court has held in two cases not necessary to the decision in *Munsey* that the surety who pays laborers' and materialmen's claims stands in the shoes of the United States and is entitled to surplus funds remaining in its hands after the contract is completed. The first is *Prairie State Bank* v. *United States,* 164 U. S. 227 (1896), and the other *Henningsen* v. *U. S. Fid. & Guar. Co.,* 208 U. S. 404 (1908). In neither of those cases, however, did the Court find that laborers and materialmen had any right against the United States but only that the "Guaranty Company [was] entitled to subrogation to any right of the United States Government arising through the building contract." *Henningsen, supra,* at p. 410.

Since the funds here have been paid into court by the Government, there is some question whether the doctrine of those cases would apply. In each of them the money was in the hands of the United States at the time the suit was commenced and was clearly applicable to payment of any debt under the contract. It would, therefore, be my view that the equities existing here in favor of the surety grow out of the contract between it and the contractor (in whose shoes the trustee now stands), which was made in consideration of the execution of the bond. Under that agreement in the event of any breach or default in the construction contract all sums becoming due thereunder were assigned to the surety to be credited against any loss or damage it might suffer thereby. In *Martin* v. *National Surety Co.,* 300 U. S. 588 (1937), this Court in an identical situation* awarded such a fund to

---

*In *Martin* the contractor assigned to the surety "all the deferred payments and retained percentages, and any and all moneys and properties that may be due and payable to the undersigned at the time of any breach or default in said contract, or . . . thereafter . . . ." *Id.,* at pp. 590–591. Here the assignment was of, *inter alia,* "Any and all

the surety. Mr. Justice Cardozo, for a unanimous Court, said: "In our view of the law, the equities in favor of materialmen growing out of that agreement [between the surety and the contractor] were impressed upon the fund in the possession of the court." *Id.*, at pp. 593–594. It is well to note also that the Court of Appeals in *Martin* had based its decision on the theory announced by the Court today, but Mr. Justice Cardozo for a unanimous Court chose the "narrower" ground of the assignment in affirming the judgment for the surety. I agree with *Martin* as to the "narrower" ground and believe the Court should keep the opinion today "within the necessities of the specific controversy" rather than enlarging upon the rules of *Henningsen* and *Prairie State Bank*. In so doing the Court would but fulfill the prophecy made in *Martin* that "the grounds chosen . . . may be expected to be helpful as a guide in other cases." *Id.*, at p. 593.

I would affirm the judgment on this basis.

---

percentages of the contract price retained on account of said contract, and any and all sums that may be due under said contract at the time of such . . . forfeiture or breach, or that thereafter may become due . . . ."