In Re WASHINGTON COMMUNICATIONS GROUP, INC., Debtor.

Anna A. M. BUSCH, Plaintiff,

v.

WASHINGTON COMMUNICATIONS GROUP, INC. and Publications, Inc., Defendants.

Bankruptcy No. 80–00304.
Adv. No. 81–0006.

United States Bankruptcy Court, District of Columbia.

April 16, 1981.

Howard A. Libby, Kennedy A. Brooks, Washington, D. C., for plaintiff.

Robert O. Tyler, Trustee, Williams, Myers & Quiggle, Washington, D. C., for defendants.

## MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

The issue raised by the plaintiff's pleadings present an intriguing question as to what extent, if any, equitable liens will be recognized under the new Bankruptcy Code. The facts of record are essentially uncontroverted[1] and disclose that the debtor, Washington Communications Group, Inc., entered into a loan agreement with plaintiff, Anna A. M. Busch, in April 1980. This is evidenced by a written memorandum of agreement dated April 11, 1980. This agreement sets forth both a repayment schedule and states that it grants the plaintiff a security interest in the newsletter "Day Care and Child Development."[2] (See Plaintiff's Amended Complaint 3–4 filed February 5,

1981). This particular newsletter, as well as others, have now been sold by the trustee in bankruptcy and plaintiff seeks to impose an equitable lien on the gross proceeds of sale, which amount to $56,000.

The facts of record further reveal that the plaintiff, Anna A. M. Busch, a British citizen, was not represented by counsel at the time of the loan agreement. The terms of the loan, including the repayment schedule, as well as the granting of a deed of trust securing real estate owned by Ray C. Henry[3] and Eleanor Henry, were fully set forth in a memorandum of agreement. This agreement was prepared by Landon G. Dowdey, Esquire, acting as an attorney for Washington Communications Group, Inc.

Plaintiff bases her claim to an equitable lien upon the following statement made by Landon G. Dowdey in his affidavit.

"Your affiant is further informed and believes that the legal components of the right to publish a newsletter are so various and intangible that, with some minor exceptions, they do not lend themselves to coverage by chattel mortgages or security instruments under the Commercial Code; that the only practicable form of security interest that may be created in such a publication is an agreement enforceable solely by application to a court of equity, that is, an equitable lien; and your affiant's best recollection is that he so informed all parties to the annexed agreement of April 11, 1980 of the substance of his opinion in this regard prior to the execution of said agreement." (Plaintiff's Exhibit 1, paragraph 4)

---

1. Although the essential facts are fully set forth in the proceedings filed by the plaintiff, Anna Busch, and the trustee, the Court received in evidence (Plaintiff's Exhibit 1) at the time of hearing an affidavit of Landon G. Dowdey, Esquire, which has been considered by the Court in connection with the pending motion. For this reason, the Court will treat the motion for judgment on the pleadings as a motion for summary judgment.

2. This newsletter, as well as others, were actually owned by Plus Publications, Inc., a related and subsidiary corporation of the debtor. The evidence of record clearly establishes that the

newsletter in issue was treated, however, as an asset of the debtor and this Court, on March 24, 1981, granted the trustee's motion to amend the caption. As a result of that order, the estates of Washington Communications Group, Inc., and Plus Publications, Inc., as well as several related subsidiaries, were consolidated for purposes of administration.

3. Ray C. Henry was the President of Washington Communications Group, Inc. at the time of the loan transaction and was acting as the principal officer of the debtor when the Chapter 11 petition was filed with this Bankruptcy Court on July 24, 1980.

Despite these assertions of debtor's former counsel, the affidavit also contains these additional assertions, amounting to what would appear as a disclaimer, namely:

"The said agreement dated April 11, 1980 next attached hereto was not prepared as a recordable instrument, nor does it purport to be a recordable instrument, and your affiant never represented to anyone that it was recordable nor that he or anyone else would or should record said instrument or prepare any other document or take any other steps to perfect or establish a lien in the publication, 'Day Care and Child Development.'" (Plaintiff's Exhibit 1, paragraph 3)

Plaintiff's claim, in large part, centers around the fact that Ms. Busch was led to believe, by reason of Mr. Dowdey's representations, that she would be "secured by all of WCG's right, title and interest in and into a certain newsletter known as 'Day Care and Child Development.'" The attorney for the debtor had apparently advanced the theory that based on the unique nature of the collateral, the newsletter did "not lend themselves to coverage by chattel mortgages or security instruments under the [Uniform] Commercial Code."

It is not disputed that the written agreement at issue is a security agreement within the definition of the Uniform Commercial Code (U.C.C.).[4] It is further undisputed that no financing statement was ever filed in order to perfect the security interest.[5] The collateral, a newsletter described as "Day Care and Child Development", is a general intangible within the U.C.C. definition which includes "any personal property ... other than goods, accounts, contract

rights, chattel paper, documents and instruments.[6] As explained by the Official Code Comment to § 9–106:

"[t]he term 'general intangibles' brings under this miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance." Uniform Commercial Code, 9–106, Official Comment.

This newsletter clearly falls under the definition of a general intangible. In fact, the affidavit of Landon G. Dowdey, Esquire, attorney for the debtor at the time the loan agreement was entered into, describes the collateral as "various and intangible." It is further evident that perfection of a security interest in general intangibles requires the filing of a financing statement.[7] However, a financing statement was never filed.[8]

The plaintiff, however, maintains that the facts of record give rise to an equitable lien and that perfection of the security interest under 28 D.C.Code § 9–402 was therefore not required. The position of the plaintiff is best summed up by the allegations set forth in plaintiff's amended complaint ¶ 6 which states: "at all times it was the intention of the parties that the true technical owner of the newsletter (Plus Publications, Inc.) was to create a lien in said newsletter in favor of Busch." In support of this position, plaintiff's counsel argues that under the Bankruptcy Code equitable liens are recognized. He bases his position on the fact that § 60(a)(6) of the old Bankruptcy Act, which did away with equitable liens, has no counterpart in the Bankruptcy Reform Act of 1978.[9] He ar-

4.  28 D.C.Code §§ 9–105(1)(h), 9–203(1)(b).

5.  *See* 28 D.C.Code § 9–403.

6.  28 D.C.Code § 9–106.

7.  28 D.C.Code § 9–302.

8.  "[I]t is a general rule that a court of equity will not, where a mistake of law is disclosed, grant equitable relief from the consequences thereof ... in the absence of fraud or undue influence.... [I]gnorance of the law excuses no one" and is insufficient to invoke equitable

relief. 27 Am.Jur. 2d, Equity § 37 at 560–61 (1966).

9.  Section 60(a)(6) of the old Bankruptcy Act was enacted in 1950 to avoid a resurrection of the pre-1938 (Chandler Act) cases which recognized equitable liens and in turn immunized them from the trustee's preference attack under § 60(a)(6) of the Bankruptcy Act. Section 60(a)(6) in pertinent part, provides that: "The recognition of equitable liens where available means of perfecting legal liens have not been employed is hereby declared to be contrary to the policy of this section."

gues that this shows an intent of Congress to permit the recognition of equitable liens under the new Bankruptcy Code. He also maintains that plaintiff's position is supported by the definition of a security interest under the new Bankruptcy Code which is broader in scope than the definition of a security interest under the U.C.C.[10]

If the Court were to accept plaintiff's agreement, based on the facts of this case,[11] the stated goals of the Uniform Commercial Code in formulating a cohesive approach to commercial transactions would have to be subverted and ignored. In *Shelton v. Erwin,* 472 F.2d 1118 (8th Cir. 1973), a case which involved a buyer and seller of an automobile who both intended to create a security interest in favor of the seller by executing a bill of sale which set out the terms of payment and the secured status of the party it was found that the security interest failed because the parties did not satisfy the formal requirements set forth in the U.C.C. The Court appropriately opined that:

> "Since the Code is not ambiguous on the requirements of the creation of an enforceable security interest, there is no reason to relax those requirements. Although the Code should be liberally construed, U.C.C. § 1–102(1), the doctrine of equitable mortgages is no longer necessary or useful in a commercial transaction since Article 9 reduces formal requisites to a minimum. · U.C.C. § 9–203, comment 5." *Shelton v. Erwin, supra,* 472 F.2d at 1119.

This Court also notes that the Gilmore Committee Report[12] in its discussions of the new Bankruptcy Code, concluded that § 60(a)(6) of the Bankruptcy Act was no longer necessary and laid it to rest with these remarks:

> "the ambiguous provisions of § 60a(6) on so-called equitable liens, which were necessary when § 60 was redrafted in the late 1940's, no longer serve any function, for the reason that Article 9 has turned the 'equitable liens' against which § 60a(6) was directed into 'unperfected security interests' which the trustee can in any case set aside."

Although this committee report dates back to 1970, it presents an uncontradicted view of Congress' intent with respect to the final enactment of 11 U.S.C. § 547.

Plaintiff's reliance on section 546(b) of the Code is misplaced. This section is a limitation on the trustee's avoidance pow-

---

**10.** According to 2 Collier on Bankruptcy § 101.-37 at 101–73 (15th ed. 1980), the expanded definition of a security interest is "a lien created by an agreement." The bankruptcy definition is broader and "will encompass all security interests under the U.C.C. as well as security interests in real property."

In expatiating upon the definition of security interest, the legislative history sets forth the following:

> "Security agreement is defined as the agreement creating the security interest. Though these terms are similar to the same terms in the Uniform Commercial Code, Article 9, they are broader. For example, the U.C.C. does not cover real property mortgages. Under this definition, such a mortgage is included, as are all other liens created by agreement, even though not covered by the U.C.C. *All U.C.C. security interests and security agreements are, however, security interests and security agreements under this definition.*" H.R. 95–595, 95th Congress, 1st Session 314 (1977). [emphasis added].

**11.** There is every indication that equitable liens arising from well-established doctrines such as equitable subrogation may well survive a trus-

tee's right under 11 U.S.C. § 544(a) or § 547. *See Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), *Danais v. M. De Matteo Construction Co.,* 102 F.Supp. 874 (D.N.H.1952), and *J. V. Gleason Co. v. Aetna Casualty & Surety Co.,* 452 F.2d 1219 (8th Cir. 1971). The facts of this case present, however, no fraud or wrongdoing; nor any basis for the imposition of an equitable lien as in the aforesaid cases. In the present case there was an agreement knowingly entered into between the parties. By the terms of the agreement, a security interest was created; however, no steps were taken to perfect that interest. The failure of the plaintiff, even assuming that it was predicated on the erroneous statement of the debtor's counsel, results strictly in an unperfected security interest. Nor are the facts present in this setting sufficient, in any way, to justify the theory of constructive trust.

**12.** · · H.R.Rep.No.595, 95th Congress, 1st Session 209 (1977), U.S.Code Cong. & Admin. News 1978, p. 5787.

ers. The trustee takes his rights subject to any applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. In this case the trustee's rights as a hypothetical judgment lien creditor relate solely to the date of bankruptcy. Because the security interest was not perfected as of that date, the trustee is successful in avoiding such an interest. *See Lewis v. Manufacturer's National Bank*, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961).

For the reasons set forth in this Memorandum Opinion, the Court concludes that the facts in this proceeding do not warrant the imposition of an equitable lien. While the parties intended to grant a security interest in a designated newsletter, the formal steps mandated by the U.C.C. to perfect that security interest were never taken. For these reasons the trustee is able to avoid plaintiff's security interest by reason of his status as a judgment lien creditor as set forth in section 544(a).

It is so ordered.