**In re CONE CONSTRUCTORS, INC., d/b/a Cone Commercial, Debtor.**

**No. 00–10589–8G7.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 14, 2001.

James E. Myers, Robert E. Morris, P.A., Tampa, FL, for Creditor, American Home Assurance Company.

John D. Emmanuel, and Donald R. Kirk, Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, FL, for Creditor, The Florida Department of Transportation.

Allan C. Watkins, Tampa, FL, for Chapter 7 Trustee, Carolyn R. Chaney.

Don M. Stichter, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for Debtor.

## ORDER ON MOTION FOR RELIEF FROM AUTOMATIC STAY OF CREDITOR, AMERICAN HOME ASSURANCE COMPANY

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court for hearing to consider the Motion for Relief from Automatic Stay filed by American Home Assurance Company.

The Debtor, Cone Constructors, Inc., was a general contractor for highway construction projects for the Florida Department of Transportation (FDOT). American Home Assurance Company (AHAC), as surety, provided payment and performance bonds for the Debtor in connection with certain FDOT contracts. AHAC contends that the Debtor defaulted under the contracts and that AHAC, as surety, has

been required to pay multiple bond claims related to the projects. Specifically, AHAC asserts that it has paid the total amount of $1,399,394.00 to bond claimants.

At the time of the hearing on AHAC's Motion for Relief from Automatic Stay, the FDOT held contract balances in the aggregate amount of $665,772.54 with respect to the projects. AHAC contends that it is entitled to the full amount of the contract balances based on its right of equitable subrogation, and also based on its perfected security interest in the Debtor's assets.

In response, the Chapter 7 Trustee contends that the contract balances constitute property of the bankruptcy estate, and that AHAC is entitled to distribution from the estate only as a general unsecured creditor.

## Background

In 1995 and 1996, the Debtor entered into contracts for the construction of certain roads or highways for the FDOT.

In accordance with § 255.05 of the Florida Statutes, before commencing work on an FDOT project, the Debtor was required to provide "a payment and performance bond with a surety insurer authorized to do business in this state as surety." Fla. Stat. § 255.05(1)(a). AHAC, as surety, provided bonds for the Debtor for some of the FDOT projects, and issued certain Contract Bonds (bonds) with the Debtor as Bond Principal.

In connection with the bonds issued by AHAC, the Debtor signed an Agreement of Indemnity dated August 26, 1997. The Agreement of Indemnity contains a provision whereby the Debtor assigned to AHAC "[a]ny and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or

not in which the Principal [Debtor] has an interest."

On June 16, 1998, AHAC filed a UCC–1 Financing Statement with the Secretary of State. In disclosing the "types or items of property" covered by the Financing Statement, AHAC referred to the "[a]ttached Agreement of Indemnity."

AHAC contends that the Debtor failed to perform its obligations under construction projects with the FDOT, and that multiple claims have been asserted against it, as surety, as a result of the defaults.

AHAC has identified five bonds that were issued for the Debtor relating to FDOT projects:

| Bond Number | FDOT Project Numbers |
|---|---|
| 145820 | 02050–3534 |
| | 02050–3538 |
| 145876 | 97160–3304 |
| | 97160–3326 |
| | 97160–6303 |
| 145870 | 97160–3306 |
| | 97160–3313 |
| | 97160–6313 |
| 145857 | 97160–3308 |
| | 97160–3315 |
| | 97160–6315 |
| 145892 | 97160–3311 |
| | 97160–3318 |

AHAC has not identified any amounts paid to bond claimants pursuant to the bond number 145820, the bond for the project referred to as "State Road 44," and contends that this project was completed by the Debtor. AHAC contends, however, that Grubbs Construction Co. has asserted a claim in the approximate amount of $180,000.00 with respect to the State Road 44 project, and that the claim is in litigation and remains outstanding.

As to the remaining four bonds, AHAC contends that it has paid the following amounts to bond claimants:

| Bond Number | FDOT Project Numbers | Amounts Paid by AHAC |
|---|---|---|
| 145876 | 97160–3304 97160–3326 97160–6303 | $ 460,035.00 |
| 145870 | 97160–3306 97160–3313 97160–6313 | $ 5,454.00 |
| 145857 | 97160–3308 97160–3315 97160–6315 | $ 433,905.00 |
| 145892 | 97160–3311 | $ 500,000.00 |

Consequently, AHAC asserts that it has paid the total amount of $1,399,394.00 to bond claimants pursuant to four bonds relating to the Debtor's projects with the FDOT.

AHAC also asserts that other claims remain pending, and that it has incurred loss adjustment expenses in the aggregate amount of $120,241.00 on all of the contracts.

At the time of the hearing on AHAC's Motion for Relief from the Automatic Stay, the FDOT was holding the total amount of $665,772.54, allocated to the FDOT projects as follows:

| Bond Number | FDOT Project Numbers | Amounts Held by FDOT |
|---|---|---|
| 145820 | 02050–3534 02050–3538 | $ 15,000.00 |
| 145876 | 97160–3304 97160–3326 97160–6303 | $ 52,436.50 |
| 145870 | 97160–3306 97160–3313 97160–6313 | $ 154,188.83 |
| 145857 | 97160–3308 97160–3315 97160–6315 | $ 47,535.02 |
| 145892 | 97160–3311 | $ 396,612.19 |

These amounts represent the contract balances owed by the FDOT on the projects.

The Debtor filed a petition under chapter 11 of the Bankruptcy Code on July 7, 2000. On December 5, 2000, the chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code.

AHAC asserts that it is entitled to the total amount of the contract balances on two separate theories. First, AHAC contends that it is entitled to the contract balances by virtue of its right of equitable subrogation. According to AHAC, a surety that performs under its bond obligations has a superior right to all contract balances owed on projects upon which it has made payments, pursuant to such right of equitable subrogation. Second, AHAC asserts that it is entitled to the contract balances because of its perfected security interest in the accounts receivable of the Debtor. According to AHAC, the perfected security interest arises from the Agreement of Indemnity and the UCC–1 Financing Statement filed with the Secretary of State.

In response, the Chapter 7 Trustee asserts that AHAC's right of equitable subrogation is not "ripe" because AHAC has not yet discharged all of its obligations under the bonds. Additionally, the Trustee claims that AHAC should not be entitled to the contract balances in the context of this bankruptcy case, because AHAC's losses relate only to the payment of unsatisfied subcontractors, and AHAC was not called upon to complete the highway projects. Finally, the Trustee contends that the general unsecured creditors of the estate will be harmed if the contract balances are not available for distribution. Accordingly, the Trustee asserts that AHAC should receive distribution only as an unsecured creditor of the estate based on the equitable considerations inherent in this case.

## Equitable Subrogation

AHAC contends that it is entitled to the contract balances due on the Debtor's highway projects with respect to which AHAC issued the five bonds, pursuant to AHAC's right of equitable subrogation.

### A. General

 In Florida, the general right of equitable subrogation is defined as "the substitution of one person in the place of another with reference to a lawful claim or right." *In re Eastern Marine, Inc.*, 104 B.R. 421, 423 (Bankr.N.D.Fla.1989)(quoting *Boley v. Daniel*, 72 Fla. 121, 72 So. 644–45 (1916)).

> The concept of equitable subrogation is "a legal fiction which arises by operation of law where one having a liability, a right, or a fiduciary relationship pays a debt owed by another under circumstances in which he is in equity entitled to the security or obligation held by the creditor whom he has paid."

*In re Eastern Marine, Inc.*, 104 B.R. at 423(quoting *Matter of Munzenrieder Corp.*, 58 B.R. 228 (Bankr.M.D.Fla.1986)).

 It is well-recognized that a surety who has been compelled to pay the debts of its principal possesses a right of equitable subrogation. "And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country and generally known as the right of subrogation, was relied on by the Court of Appeals in this case." *Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 136–37, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).

The scope of a surety's right of equitable subrogation in Florida was explained by the Supreme Court of Florida

But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety— who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

*Transamerica Insurance Company v. Barnett Bank of Marion County, N.A.*, 540 So.2d 113, 115–16 (Fla.1989). In *Transamerica*, the Florida Supreme Court found that a surety's right of equitable subrogation with respect to unpaid contract amounts was entitled to priority over the claims of the bank that financed the project, to the extent of the surety's performance. *Transamerica*, 540 So.2d at 117.

A typical surety relationship is created where a contractor undertakes a construction project and obtains a bond to assure its performance under the contract. Contractors that undertake public projects generally are required by statute to obtain both payment and performance bonds. See, for example, 40 U.S.C. § 270a and Fla. Stat. § 255.05. If the contractor on a public project defaults on the contract, and the surety performs under its bond obligations, the surety is entitled to its right of equitable subrogation as set forth in *Transamerica*.

### B. *Pearlman*

If the contractor files a bankruptcy petition after defaulting on the project, however, an issue arises concerning the relative rights as between the trustee of the contractor's bankruptcy estate and the surety who has made payments to bond claimants. Specifically, where the owner has

retained contract payments pending the satisfactory completion of the project, the bankruptcy trustee and the surety may both claim an interest in the funds.

The United States Supreme Court addressed this issue in *Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). "This is a dispute between the trustee in bankruptcy of a government contractor and the contractor's payment bond surety over which has the superior right and title to a fund withheld by the Government out of earnings due the contractor." *Pearlman*, 371 U.S. at 133, 83 S.Ct. 232.

One argument against the surety's claim is that this controversy is governed entirely by the Bankruptcy Act and that § 64, 11 U.S.C. § 104, 11 U.S.C.A. § 104, which prescribes priorities for different classes of creditors, gives no priority to a surety's claim for reimbursement. But the present dispute—who has the property interests in the fund, and how munch—is not so simply solved. Ownership of property rights before bankruptcy is one thing; priority of distribution in bankruptcy of property that has passed unencumbered into a bankrupt's estate is quite another. Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors. [footnote omitted] So here if the surety at the time of adjudication was, as it claimed, either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of the surety never became a part of the bankruptcy estate to be ad-

ministered, liquidated, and distributed to general creditors of the bankrupt. This Court has recently reaffirmed that such property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy. [footnote omitted] Consequently our question is not who was entitled to priority in distributions under § 64, but *whether the surety had, as it claimed, ownership of, an equitable lien on, or a prior right to this fund before bankruptcy adjudication.*

*Pearlman*, 371 U.S. at 135–36, 83 S.Ct. 232. (Emphasis supplied). The Supreme Court concluded:

We therefore hold ... that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that *the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.* [footnote omitted.] *Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it.*

*Pearlman*, 371 U.S. at 141–42, 83 S.Ct. 232. (Emphasis supplied). The Supreme Court affirmed the decision of the Second Circuit Court of Appeals that the right of the surety in that case had priority over the general unsecured creditors of the contractor's bankruptcy estate. *Id.* at 142, 83 S.Ct. 232.

### C. Effect of *Pearlman* after the enactment of the Bankruptcy Code

Clearly, *Pearlman* was decided prior to the enactment of the Bankruptcy Code. Recent cases have established, however,

that the holding set forth in *Pearlman* remains controlling law. *In re QC Piping Installations, Inc.*, 225 B.R. 553 (Bankr. E.D.N.Y.1998), for example, contains a studious analysis of *Pearlman* and the cases that have followed it.

In *QC Piping*, the debtor/contractor had defaulted on a construction contract with an agency of the State of New York prior to the time that the contractor filed a bankruptcy petition, and the contractor's surety had completed the construction and paid the claims of the contractor's laborers and materialmen. *In re QC Piping*, 225 B.R. at 556–57. The issue before the Court involved competing claims asserted by the trustee of the debtor/contractor's chapter 7 estate, and by the contractor's surety, to money retained by the state agency as owner of the project. *Id.* at 555.

The Court in *QC Piping* first found that "it is now irrefutable that a surety, after satisfying its obligations under either a payment or performance bond, is subrogated to the rights of the party he paid." *Id.* at 562. The Court then discussed *Pearlman* as the "sole United States Supreme Court case" which addressed the effect of subrogation rights on the competing interests of sureties, public project owners, and contractors "in a bankruptcy context." *Id.* at 563. The issue was whether the holding in *Pearlman* remained applicable law in view of the definition of property of the estate set forth in § 541 of the Bankruptcy Code. *Id.* at 564.

To evaluate the issue, the Court in *QC Piping* reviewed other decisions under the current Bankruptcy Code regarding such competing claims to contract funds, and found that the "majority of bankruptcy courts ... have concluded that retainage is not property of the debtor-contractor's estate where there has been a pre-petition default and a surety has stepped in under its bonds." *Id.* at 566. See, for example,

*In re Ward Land Clearing & Drainage, Inc.*, 73 B.R. 313 (Bankr.N.D.Fla.1987). The Court in *QC Piping* concluded:

> Therefore, the Court believes that *Pearlman* requires it to find, on the undisputed facts before it, that the retainage is not property of QC's estate as a matter of law. *See Bankruptcy 1984, supra*, 20 Forum at 747 ("Clearly the law has not changed in the *Pearlman*-type situation. When at the time of the filing of the bankruptcy petition the work is complete but the debtor has defaulted in paying its labor and material obligations and the surety has paid them, the estate has no property interest under § 541 in the contract proceeds. The reason is obvious, because of the debtor's default and the surety's payment prior to filing, the surety by default has assumed all of the debtor's rights. The debtor has none.")

*In re QC Piping*, 225 B.R. at 569. In other words, since the debtor/contractor had defaulted and the surety had stepped into the shoes of the debtor prior to the filing of the bankruptcy case by performing under the bond, "whatever rights the debtor had in the contract passed to the surety by virtue of the doctrine of subrogation, prior to bankruptcy." *Id.* at 568. The contract funds were not property of the chapter 7 estate under § 541 of the Bankruptcy Code.

The Court's decision in *QC Piping* is consistent with decisions reached by bankruptcy courts in Florida. *In re Padula Construction Company, Inc.*, 118 B.R. 143 (Bankr.S.D.Fla.1990), for example, involved a School Board construction project, and the School Board had withheld funds related to the project. The surety asserted that it was entitled to the funds, as against the School Board and the contractor/chapter 11 debtor, by virtue of its payments on behalf of the debtor to com-

plete its obligations. *In re Padula Construction,* 118 B.R. at 144. The Bankruptcy Court framed the issue: "the heart of the matter is a determination of property rights. Are the contract proceeds retained by the School Board property of the DIP, or of CNA [the surety]?" *Id.* at 144. The Court relied in large part on the decision of the Florida Supreme Court in *Transamerica, supra,* to conclude:

> In short, if the DIP is in default prepetition as alleged, then CNA is an equitable subrogee, notwithstanding the DIP's rejection of its indemnity agreement.... Florida law clearly provides that a surety is entitled to equitable subrogation not only to the position of subcontractors and materialmen, but also to the positions of the DIP and the School Board. Accordingly, the DIP cannot relegate CNA, its surety, to the status of a mere unsecured creditor.

*Id.* at 146. Where a surety pays claims or completes a project, or both, it acquires a superior right to the contract proceeds. *Id.*

Another Florida bankruptcy case that reached the same conclusion is *In re Caddie Construction Co., Inc.,* 125 B.R. 674 (Bankr.M.D.Fla.1991). That case involved an action by a surety against a contractor's chapter 7 trustee to recover certain funds held by the owners of a public construction project. The Court relied on *Pearlman* to conclude that, "if a surety completes a job and pays subcontractors and material suppliers, the surety has a common-law right to the interest of the bankruptcy estate." *In re Caddie Construction,* 125 B.R. at 678. The Court found, therefore, that "[b]ased on the principle of equitable subrogation, this Court is satisfied that MCA [the surety] is, as a matter of law, entitled to recover the remainder of the unpaid contract balance on the Altamonte Springs contracts." *Id.* at 678.

In *QC Piping,* the Court relied on *Pearlman* to find that the bankruptcy estate had no property interest in the contract proceeds under § 541 of the Bankruptcy Code. *QC Piping,* 225 B.R. at 569. Other cases that evaluated *Pearlman* following the enactment of the Bankruptcy Code also have found that a surety acquired "ownership of, an equitable lien on, or a prior right to" the contract balance, where the contractor defaulted and the surety performed under its bond obligations prior to the filing of the contractor's bankruptcy petition. *Pearlman,* 371 U.S. at 136, 83 S.Ct. 232.

In *In re The Massart Company,* 105 B.R. 610 (W.D.Wash.1989), for example, a surety on a public works project filed an action against the chapter 7 trustee and sought a declaration that it was the owner of the final progress payment on the project. *In re The Massart Company,* 105 B.R. at 611. The District Court concluded that the surety had an equitable lien on the progress payment that related back to the date that the payment and performance bonds were executed, and that the surety's right of equitable subrogation therefore superseded the interest of the trustee in the payment. *Id.* at 612.

> The court rules as a consequence, that Massart did not have a legal or equitable interest in the progress payment at the time it declared bankruptcy. *See Pearlman,* 371 U.S. at 136, 83 S.Ct. at 234–35. Thus, under 11 U.S.C. § 541, the progress payment was not the property of the bankruptcy estate, and the trustee should turn the progress payment over to United Pacific [the surety].

*Id.* at 613. See also *In re E.R. Fegert, Inc.,* 88 B.R. 258, 260 (9th Cir. BAP 1988)("[T]he surety is granted an equitable lien on contract proceeds so as to protect the surety whose performance enables funds to become available under the con-

tract.... Thus, the equitable lien granted the surety entitles it to precedence over the Trustee in bankruptcy of the debtor-contractor.").

### D. Conclusion

 Based on the authorities discussed above, the Court finds that a surety is entitled to a right of equitable subrogation with respect to any contract funds owed by the owner of a project, where a debtor/contractor has defaulted on a public construction project, and the surety has performed its obligations under a bond. Further, where the debtor/contractor files a chapter 7 bankruptcy petition following its default, the surety's right of equitable subrogation is superior to any interest that the chapter 7 trustee may claim in the contract funds, to the extent of the surety's performance under the bond.

### E. Application

 In this case, AHAC seeks relief from the automatic stay to assert its rights to the contract balances owed by the FDOT on the Debtor's highway construction projects that were covered by five payment and performance bonds issued by AHAC. The total amount of the contract balances is $665,772.54. AHAC contends that the Debtor defaulted under the contracts, that AHAC as surety has paid the total amount of $1,399,394.00 to bond claimants pursuant to four bonds relating to the contracts, and that other bond claims remain pending.

Based on the decision of the United States Supreme Court in *Pearlman,* and the cases arising thereunder, the Court finds that AHAC has a right of equitable subrogation with respect to the contract funds. The Court further finds that AHAC's interest in the contract balances is superior to the interest of the Chapter 7 Trustee, to the extent that AHAC has made payments under bonds that relate to the specific contracts.

Since the amounts paid by AHAC to bond claimants pursuant to each of bonds 145876, 145857, and 145892, exceed the balances owed on the projects covered by each of those bonds, AHAC is entitled to the balances now held by the FDOT on the contracts covered by each of those bonds:

| Bond Number | FDOT Project Numbers | Amounts Paid by AHAC | Amounts Held by FDOT |
|---|---|---|---|
| 145876 | 97160–3304 97160–3326 97160–6303 | $ 460,035.00 | $ 52,436.50 |
| 145857 | 97160–3308 97160–3315 97160–6315 | $ 433,905.00 | $ 47,535.02 |
| 145892 | 97160–3311 97160–3318 | $ 500,000.00 | $ 396,612.19 |

The total of these amounts is $496,583.71.

With respect to bond 145870, AHAC has paid bond claimants the amount of $5,454.00, and the contract balance is $154,188.83. Accordingly, AHAC is entitled to the amount of $5,454.00 from this contract balance.

With respect to bond 145820, AHAC has not paid any bond claims at this time, and has not quantified any loss that it may have incurred as to this bond. Consequently, AHAC is not entitled, at this time, to the $15,000 contract balance related to this contract on the basis of equitable subrogation.

AHAC asserts, however, that claims by laborers and materialmen on the projects remain pending. As to bond 145820, for example, Grubbs Construction Company has asserted a claim in the approximate amount of $180,000.00, and the claim continues in litigation. AHAC further asserts that it has incurred loss adjustment expenses in the aggregate amount of $120,241.00 on all of the bonds. At the time of the hearing on the Motion for Relief from Automatic Stay, these loss ad-

justment expenses were not allocated as between the five bonds.

Since bond claims remain outstanding, and since AHAC has incurred expenses that have not yet been allocated to specific contracts, the Trustee or the FDOT shall hold the amount of $148,734.83 related to bond 145870 ($154,188.83 minus $5,454.00) and the amount of $15,000.00 related to bond 145820, until the pending bond claims are resolved or until AHAC establishes an identifiable loss associated with these bonds.

### Security Interest

■ AHAC also asserts that the amounts are due to it on the basis of its security interest in the contract proceeds. The Trustee opposes this assertion. A determination of the entitlement of AHAC to the funds based or its security interest would first presume that the funds are property of the bankruptcy estate and then presume that AHAC has the first priority security interest in the funds. As discussed above, the funds may not be property of the bankruptcy estate. Further, it is not appropriate to presume that AHAC has the first priority security interest in the funds, since there may be other entities claiming interests in the funds. Such determination should be made in the context of an adversary proceeding, as provided by Fed. R. Bankr.P. 7001.

Accordingly:

**IT IS ORDERED** that:

1. The Motion for Relief from Automatic Stay filed by American Home Assurance Company is granted in part and denied in part as set forth in this Order.

2. The automatic stay of § 362 of the Bankruptcy Code is modified to permit American Home Assurance Company to pursue its rights in the contract balances related to bonds 145876, 145857, and 145892, including AHAC's right to demand payment of the amounts now held by the Florida Department of Transportation with respect to the contracts covered by these bonds:

| Bond Number | FDOT Project Numbers | Amounts Held by FDOT |
|---|---|---|
| 145876 | 97160–3304 97160–3326 97160–6303 | $ 52,436.50 |
| 145857 | 97160–3308 97160–3315 97160–6315 | $ 47,535.02 |
| 145892 | 97160–3311 97160–3318 | $ 396,612.19 |

3. The automatic stay of § 362 of the Bankruptcy Code is modified to permit American Home Assurance Company to pursue its rights as to the amount of $5,454.00 related to bond 145870, including AHAC's right to demand payment of the amount of $5,454.00 from the Florida Department of Transportation. The Trustee or the Florida Department of Transportation shall continue to hold the amount of $148,734.83 related to bond 145870, however, pending proof by AHAC that it has incurred additional losses directly associated with the bond, or a determination that AHAC is entitled to some or all of the amount on a basis other than equitable subrogation.

4. The Motion for Relief from Automatic Stay is denied as to the sum of $15,000 associated with bond 145820, and the Trustee or the Florida Department of Transportation shall continue to hold these contract funds, pending proof by AHAC that it has incurred a loss directly associated with the bond, or a determination that AHAC is entitled to some or all of the amount on a basis other than equitable subrogation.