STATE OF MINNESOTA

IN SUPREME COURT

A23-1478

Court of Appeals                                                                                          Hennesy, J.
                                                                              Took no part, Procaccini, J.

In re the Receivership of United Prairie Bank,

                        Respondent,

vs.

Molnau Trucking LLC, et al.,

                        Defendants,

Granite Re, Inc.,                                                                     Filed: July 16, 2025
                                                                          Office of Appellate Courts

                        Appellant.

_____

Thomas H. Boyd, Andrew J. Steil, Kyle R. Kroll, Winthrop & Weinstine, P.A., Minneapolis, Minnesota, for respondent.

Daniel R. Gregerson, Daniel A. Ellerbrock, Nicholas J. Sideras, Gregerson, Rosow, Johnson & Nilan, Ltd., Minneapolis, Minnesota, for appellant.

Joseph J. Witt, Teresa E. Rice, Minnesota Bankers Association, Eden Prairie, Minnesota, for amicus curiae Minnesota Bankers Association.

Patrick J. O'Connor, Jr., POConnor ADR LLC, Minneapolis, Minnesota, for amicus curiae Surety & Fidelity Association of America.

_____

1

1.      A performing construction surety need not show any mistake of fact to exercise its right of equitable subrogation.

2.      A surety's right to equitable subrogation is not a security interest subject to the Uniform Commercial Code (UCC), Minn. Stat. §§ 336.9-101 to 336.9-809 (2022), and the UCC's first-in-time priority rule.  Instead, through the doctrine of equitable subrogation, a performing surety has priority over a secured creditor as to contract funds created by the surety's performance on its bond obligations.

Reversed and remanded.

OPINION

HENNESY, Justice.

This appeal arises from a dispute between a surety bond company, appellant Granite Re, Inc. (Granite), and a creditor bank, respondent United Prairie Bank (UPB), regarding entitlement to funds held by a receiver in a receivership action.  Granite issued payment bonds to Molnau Trucking LLC (Molnau) for public works projects.  Molnau defaulted on the public works projects.  Molnau also defaulted on loans from UPB.  At issue is whether Granite or UPB has priority to the bonded contract funds held by the receiver.  Granite argues that it has priority as a performing construction surety under the doctrine of equitable subrogation because it paid laborers and suppliers for their work on the projects. UPB argues that it has priority under the Uniform Commercial Code (UCC), Minn. Stat. §§ 336.9-101 to 336.9-809 (2022), because UPB perfected its security interests in Molnau's accounts receivable before Granite issued the payment bonds.  We conclude that

2

Granite, as the construction surety, has the superior interest in the bonded contract funds as a matter of law, and we therefore reverse the court of appeals decision affirming the district court's grant of summary judgment in favor of UPB and we remand to the district court.

## FACTS

The relevant events in this receivership action took place between 2020 and 2023. During this time, Molnau entered into financial relationships with both UPB and Granite.[1] From April to September 2020, UPB issued three loans to Molnau with a total loan amount of $3,258,400. As collateral for the loans, Molnau granted UPB security interests in Molnau's business assets, which included Molnau's "accounts," "money," "rights to payment," and "general intangibles," all "whether now existing or hereafter arising." Immediately after issuing each loan, UPB perfected its security interests in Molnau's present and future accounts receivable by filing UCC financing statements with the Minnesota Secretary of State.

For Molnau to enter into contracts to perform certain public works projects, Molnau was required to provide bonds to ensure that it would complete the projects and pay the laborers and suppliers. *See* Minn. Stat. § 574.26, subd. 2 (2024). In March 2020, Molnau executed a general agreement of indemnity in favor of Granite, a surety company, as

---

[1] Molnau was a party in the district court action UPB filed but is not a party to this appeal.

consideration for Granite issuing these bonds for Molnau as part of a surety relationship.[2] The next year, in the spring of 2021, Molnau entered into construction contracts with Wright County, the City of Champlin, and the City of Saint Michael (collectively, the government entities). Granite issued payment and performance bonds for each of these public works projects. Only the payment bonds are at issue here. Granite issued the payment bonds several days after the dates of the corresponding contracts. The payment bonds imposed an obligation on Granite to promptly pay any unpaid claimant for any undisputed amount, including interest, upon Molnau's default.

Molnau later failed to pay some of the laborers and suppliers on the public works projects. The laborers and suppliers filed claims against Granite's payment bonds. Granite paid a total of $741,998 to discharge its obligations under the payment bonds.

Molnau also defaulted on its loan agreements with UPB. In December 2021, UPB sued Molnau for its default and requested that the district court appoint a receiver over Molnau's assets, among other relief. The district court appointed a limited receiver to manage Molnau's assets.

During the spring and summer of 2022, the receiver worked to identify Molnau's assets that were subject to the receivership, which included accounts receivable owed to

---

[2]     In this agreement, Molnau agreed to indemnify Granite from any loss or liability resulting from the bonds and agreed that Granite would be subrogated to all Molnau's rights in any such bonded contracts, "including deferred and reserved payments, current and earned estimates and final payments." This contractual subrogation right is a distinct remedy from the equitable subrogation right at issue in this opinion.

Molnau. The receiver reported on Molnau's failure to pay laborers and suppliers on the public works projects, stating:

> A number of the Molnau Trucking projects for local municipalities required a performance bond and/or retainage escrow funds to be established as a condition of the various contracts. The Receiver is discovering that a number of these projects were either not completed, had remaining "punch list" issues to address, had unpaid sub-contractors or were generally deficient (per the customer) and the retainage funds and/or underlying performance bonds have or may be accessed to complete these projects. Therefore, much of the accounts receivable asset is either overstated or non-existent.

The receiver contacted Granite and the government entities for information about the projects. Through this process, the receiver identified certain contract funds in which both Granite and UPB claimed an interest. These funds would have been due to Molnau under its contracts with the government entities. Molnau, however, had defaulted on these contracts, and Granite claimed it was entitled to the funds under the doctrine of equitable subrogation. At the time the receiver identified the funds, the government entities were holding some of the funds as retainage[3] and had paid the rest to an escrow company Granite was using to hold contract funds and disburse payments to claimants. The receiver, Granite, and UPB all agreed that the funds in dispute should be paid to the receiver, who would hold them in a segregated account until the dispute was resolved.

At the end of 2022, the receiver filed a motion requesting that the district court set a briefing schedule for UPB and Granite to assert their claims to the disputed funds. The

---

[3] In the construction context, "retainage" refers to the practice of holding back a percentage of each month's payment to a contractor until the project has been completed. 1 Alvin L. Arnold & Myron Kove, *Construction & Development Financing* § 4:58 (3d ed. 2024).

receiver did not take a position on these claims. In the meantime, the receiver asked the court to order the government entities to pay the receiver the amounts allegedly owed to Molnau, including retainage amounts. The district court granted the receiver's motion. The total amount of funds ultimately deposited with the receiver was $456,031 (the bonded contract funds).

UPB and Granite then brought cross-motions for summary judgment, each claiming it was entitled to the bonded contract funds. Granite argued that under the doctrine of equitable subrogation it has priority as a surety that was required to perform under its bond. UPB argued that it has priority as a first-in-time secured lender under the UCC.

The district court granted UPB's motion for summary judgment and denied Granite's. The court recognized that, as a performing surety, Granite has an equitable right of subrogation to the bonded contract funds. The court ruled, however, that UPB has priority because UPB had perfected its security interest in Molnau's accounts receivable before Granite issued the payment bonds. The district court subsequently issued an order and judgment, which directed the receiver to pay the bonded contract funds to UPB, terminated the receivership, and discharged the receiver.

Granite appealed, and the court of appeals affirmed. *United Prairie Bank v. Molnau Trucking LLC*, No. A23-1478, 2024 WL 1987878 (Minn. App. May 6, 2024). In determining that Granite did not have a right to equitable subrogation, the court of appeals relied on case law addressing equitable subrogation in the mortgage context. *Id.* at *2 (citing *Carl H. Peterson Co. v. Zero Ests.*, 261 N.W.2d 346, 348 (Minn. 1977)). The court of appeals concluded that the district court properly granted summary judgment to UPB

6

because Granite did not satisfy the first prong of equitable subrogation under the test established in *Carl H. Peterson Co. v. Zero Estates*, 261 N.W.2d at 348—"that [Granite] acted under a justifiable or excusable mistake of fact" in paying the laborers and suppliers. *Id.* Additionally, the court of appeals concluded that UPB retained priority over any interest that Granite could have acquired in the bonded contract funds through equitable subrogation because the bank had filed its UCC statements and perfected its security interest in Molnau's accounts receivable before Granite's equitable subrogation claim attached. *Id.* at *3–4. The court of appeals therefore concluded that the district court properly awarded the funds to UPB. *Id.* at *4.

Granite filed a petition seeking review of two issues. First, what is the appropriate standard for evaluating whether a surety or other party is entitled to equitable subrogation after discharging the obligations of another? And second, does a surety making payment under a payment or performance bond have an equitable right to remaining contract funds that takes priority over the rights of a third-party lender, regardless of the timing of UCC filings? We granted review.

**ANALYSIS**

On an appeal from summary judgment, we review de novo whether there are genuine issues of material fact and whether the district court erred in its application of the law to the facts. *Com. Bank v. W. Bend Mut. Ins. Co.*, 870 N.W.2d 770, 773 (Minn. 2015). When, as here, a district court determines equitable claims as a matter of law at summary judgment—rather than by weighing the equities—we apply de novo review. *SCI Minn.*

7

*Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 860–61 (Minn. 2011).

Before we turn to the questions in this case, we briefly review the role of suretyship in public works projects to provide the legal context in which this conflict arose. Under the Public Contractors' Performance and Payment Bond Act, Minn. Stat. §§ 574.26–.32 (2024), contractors engaging in public works projects must secure bonds to guarantee that projects are completed and that laborers and suppliers are paid. Specifically, this act requires performance and payment bonds for public works projects:

> [A] contract with a public body for the doing of any public work is not valid unless the contractor gives (1) a performance bond to the public body with whom the contractor entered into the contract, for the use and benefit of the public body to complete the contract according to its terms, and conditioned on saving the public body harmless from all costs and charges that may accrue on account of completing the specified work, and (2) a payment bond for the use and benefit of all persons furnishing labor and materials engaged under, or to perform the contract, conditioned for the payment, as they become due, of all just claims for the labor and materials.

Minn. Stat. § 574.26, subd. 2. The purpose of the bonds is "to protect laborers and materialmen who perform labor or furnish material for the execution of a public work to which the mechanic's lien statute does not apply."[4] *Ceco Steel Prods. Corp. v. Tapager*, 294 N.W. 210, 212 (Minn. 1940).

In the public construction context, suretyship involves a three-party relationship between the surety, the contractor, and the project owner, or obligee. *See* Peter A. Alces

---

[4] Under Minn. Stat. § 514.01 (2024), laborers and suppliers can obtain liens on property they improve to secure payment for their services. These liens, however, are not

8

& Susan Sieger-Grimm, *The Law of Suretyship and Guaranty* § 10:1 (2024). By issuing bonds, the surety guarantees and becomes secondarily liable for the performance of a promise made by a contractor to the project owner. Charles R. Gossage, *A Primer in Contract Surety Law*, *in Fundamentals of Construction Law* 157, 158 (Carina Y. Enhada et al. eds. 2001). Sureties have a variety of contractual and common law remedies to recoup losses, either from contractors directly or from the funds due under bonded contracts.[5] *Id.* at 165, 169–70. One of these remedies is the right of equitable subrogation. *Nat'l Sur. Co. v. Berggren*, 148 N.W. 55, 56–57 (Minn. 1914) (discussing the availability of equitable subrogation to sureties).

As a general matter, "subrogation" refers to the "substitution of one party for another whose debt the party pays, which entitles the paying party to step into the shoes, or be substituted to all the rights, priorities, remedies, liens, and securities of, the other party." *Melrose Gates, LLC v. Chor Moua*, 875 N.W.2d 814, 817 (Minn. 2016). "Equitable subrogation has its origins in common law, and its purpose is to place the responsibility for the payment of the debt upon the one who in equity ought to pay it." *Id.* at 818.

---

available on public property. *Burlington Mfg. Co. v. Bd. of Courthouse & City Hall Comm'rs*, 69 N.W. 1091, 1091 (Minn. 1897).

[5] A key difference between suretyship and insurance is that sureties do not expect to bear the risk of loss. *See* William Schwartzkopf, *Practical Guide to Construction Contract Surety Claims* § 1.02 (3d ed. 2018) (explaining that "[i]n suretyship . . . losses are not calculated into the premium" and that "when a surety makes a payment, the principle and any indemnitors are expected to repay the surety's losses").

In the construction surety context, the United States Supreme Court has noted that "probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37 (1962). We have a long line of cases, dating back over 100 years, recognizing the right of a construction surety to equitable subrogation when the surety has performed the obligations of a contractor to pay laborers and suppliers. *See, e.g.*, *First Nat'l Bank of Saint Paul v. McHasco Elec., Inc.*, 141 N.W.2d 491, 492 (Minn. 1966); *Hartford Accident & Indem. Co. v. Fed. Constr. Co.*, 209 N.W. 911, 913 (Minn. 1926); *Barrett Bros. Co. v. Saint Louis County*, 206 N.W. 49, 50 (Minn. 1925); *Berggren*, 148 N.W. at 56; *Cassan v. Maxwell*, 40 N.W. 357, 358 (Minn. 1888).

I.

Granite, the surety, first challenges the court of appeals' conclusion that it does not have a right to the bonded contract funds under the doctrine of equitable subrogation because it did not act "under a justifiable or excusable mistake of fact" in paying on the bonds. *United Prairie Bank*, 2024 WL 1987878, at *2. In reaching this conclusion, the court of appeals relied on our decision in *Peterson*, which involved a mechanic's lien foreclosure action in which a bank claimed priority through its mortgage under the doctrine of equitable subrogation. 261 N.W.2d at 347–48. We held in *Peterson* that equitable subrogation was available "where one party has provided funds used to discharge another's

10

obligations if (a) the party seeking subrogation has acted under a justifiable or excusable mistake of fact and (b) injury to innocent parties will otherwise result." *Id.* at 348.

Granite does not argue that it made payments on the bonds based on a mistake of fact. Rather, Granite argues that the "mistake of fact" standard we articulated in *Peterson* is not "a requirement for equitable subrogation in the context of a performing construction surety." UPB, on the other hand, argues that the court of appeals properly applied the "mistake of fact" standard here, asserting that "[t]he 'mistake of fact' element embodies the maxim that 'equity aids the vigilant, and not the negligent.' " *See, e.g., Citizens State Bank v. Raven Trading Partners, Inc.*, 786 N.W.2d 274, 287 (Minn. 2010). UPB notes that Granite was on notice of UPB's interest in Molnau's accounts receivable at the time it issued its bonds, and that Granite could have declined to issue the bonds or otherwise attempted to protect its interests, for example, by negotiating a subordination agreement.

We hold that the "mistake of fact" standard does not apply in the context of a performing construction surety. We have applied the doctrine of equitable subrogation in a wide variety of contexts beyond construction sureties, including cases involving insurance, mortgages, and taxes. *E.g., RAM Mut. Ins. Co. v. Rohde*, 820 N.W.2d 1, 10–14 (Minn. 2012) (discussing an insurer's right to pursue an equitable subrogation claim against an insured's negligent tenant); *First Nat'l Bank of Menahga v. Schunk*, 276 N.W. 290, 292–93 (Minn. 1937) (discussing the right of a lender who paid off a senior mortgage on a property to be equitably subrogated to the rights of the senior mortgagee); *Sucker v. Cranmer*, 149 N.W. 16, 18 (Minn. 1914) (discussing the rights of a purchaser at a foreclosure sale who paid taxes on a property during the redemption period to be equitably

11

subrogated to the State's right to collect taxes from the original property owners after they exercised their right of redemption). We have declined to apply the doctrine of equitable subrogation uniformly across these different contexts. As we pointed out in *Citizens State Bank v. Raven Trading Partners, Inc.*, there are a variety of reasons that a party may be entitled to equitable subrogation—for example, "when a party satisfies a lien in order to protect that party's interest, when a party is under a legal duty to satisfy a lien, or when there is a misrepresentation, mistake, duress, undue influence, or deceit." 786 N.W.2d at 284–85. Thus, mistake can be one, but is not the only, reason that a party may be entitled to equitable subrogation.

In the suretyship context, a surety that performs its obligations under a bond it has issued does not need to establish mistake to assert the right of equitable subrogation. *Berggren*, 148 N.W. at 55; *Barret Bros.*, 165 N.W. at 49; *McHasco*, 141 N.W.2d at 491. Our case law in this context is clear that a performing construction surety is entitled to equitable subrogation when the surety pays a contractor's debt to a third party, because the surety "paid such debt on compulsion, and not as a mere volunteer." *Berggren*, 148 N.W. at 56. In *National Surety Co. v. Berggren*, for instance, a surety company issued a payment bond for a contract to install an electric switchboard in a state hospital. *Id.* at 55. After work on the contract had begun, the contractor assigned its right to the contract funds to a third party. *Id.* at 56. When the contractor failed to pay one of its suppliers, the surety paid the supplier according to the terms of the surety bond and sought reimbursement through the contract fund. *Id.* We explained that when a surety is compelled to pay a contractor's debt due to a third party, "the right of the surety to assert the equitable doctrine of

12

subrogation is elementary." *Id.* (citing *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227 (1896)).

In the mortgage context, on the other hand, we have required lenders to show a justifiable or excusable mistake of fact to claim the right of equitable subrogation. In *Peterson*, for instance, a bank held both first and second mortgages on a property. 261 N.W.2d at 347. At the time the second mortgage was filed, visible construction of a barn was taking place on the land. *Id.* When labor and material suppliers later attempted to foreclose on mechanic's liens they held on the barn, the bank claimed that because the second loan was used in part to pay off the first mortgage, its second mortgage should be equitably subrogated to its first mortgage, and therefore take priority over the mechanic's liens. *Id.* at 348. We held that the bank was not entitled to subrogate its second mortgage to its first mortgage to receive priority over the mechanic's lien, noting that the bank was a professional lender and should have known that the construction of the barn could give rise to liens. *Id.* In that context, we held that equitable subrogation "will be applied in the interest of substantial justice" when "one party has provided funds used to discharge another's obligations if (a) the party seeking subrogation has acted under a justifiable or excusable mistake of fact, and (b) injury to innocent parties will otherwise result." *Id.*

In reaching our conclusion in *Peterson*, we relied on a line of cases addressing equitable subrogation in the mortgage context. *Id.*; *see Sucker*, 149 N.W. at 18; *Elliott v. Tainter*, 93 N.W. 124, 124 (Minn. 1903); *Emmert v. Thompson*, 52 N.W. 31, 31 (Minn. 1892). We did not cite *Berggren* or any other case from our long line of cases addressing equitable subrogation in the surety context. *See, e.g.*, *Berggren*, 148 N.W. at 56; *Barrett*

13

*Bros.*, 206 N.W. at 49; *McHasco*, 141 N.W.2d at 493. These cases, all of which remain good law, have developed as two distinct lines with different rules for their respective contexts. The rules in our mortgage line of cases do not apply when equitable subrogation is available in the suretyship context, just as the suretyship line of cases does not govern the availability of equitable subrogation in the mortgage context.

Because Granite, as the surety, was contractually obligated to pay Molnau's debts to laborers and suppliers under the bond agreements, we hold that Granite is entitled to assert the right of equitable subrogation here. The court of appeals erred by applying the *Peterson* rule requiring Granite to show an excusable or justifiable mistake of fact.

## II.

Having determined that Granite, as surety, has the right of equitable subrogation, we now consider the question of priority: whether UPB, as a secured creditor, has priority over Granite, a performing surety, with respect to the bonded contract funds. We begin by explaining why the UCC's priority rules do not govern this situation. We then discuss our case law on the relative priority of sureties and secured lenders. Finally, we comment on the policy concerns that underlie our case law.

## A.

The court of appeals held that even if Granite is entitled to equitable subrogation, Granite would not prevail because UPB takes priority under a first-in-time analysis under the UCC. *United Prairie Bank*, 2024 WL 1987878, at \*3–4. For the following reasons, we disagree.

14

This case presents the first occasion for us to address the relative rights of sureties and secured lenders when a lender's rights predate a surety's.[6]  In some of our prior cases, we have mentioned the surety's earlier interest, among other considerations, in deciding that the surety had priority.  *E.g.*, *Berggren*, 148 N.W. at 57; *Barrett Bros.*, 206 N.W. at 50.  We hold here that timing is not dispositive in determining priority in this specific context.

Under Article 9 of the UCC, priority among secured creditors is typically determined by a first-in-time analysis.  *See* Minn. Stat. § 336.9-322(a)(1).  A surety's right to equitable subrogation, however, is not a security interest governed by the UCC.  *See* Minn. Stat. § 336.9-109(a)(1) (stating that "this article applies to . . . a transaction, regardless of its form, that creates a security interest in personal property or fixtures *by contract*" (emphasis added)).  We find the Eighth Circuit's conclusion that a surety's equitable subrogation claim is not a UCC "security interest" persuasive.  *See In re J.V. Gleason Co.*, 452 F.2d 1219, 1222 (8th Cir. 1971).  In *In re J.V. Gleason Co.*, the court first noted that Article 9 of the UCC was intended to apply to consensual security agreements.  *Id.*  The right of equitable subrogation is not created by consent of the parties through a contract; it is created by law to avoid injustice.  *Id.*  Second, the Eighth Circuit reasoned that sureties are in a very different position from commercial lenders, noting that, while sureties extend their credit to contractors "as the ultimate guarantee that the job will

---

[6]     The right of equitable subrogation takes effect "as of the date of the contract creating the relation of principal and surety; that is, the bond."  *Berggren*, 148 N.W. at 57.  Granite issued the relevant bonds in the spring of 2021, after UPB perfected its security interest.

15

be done, this is a credit that may either never have to be drawn upon or, if it is drawn upon at all, will in all likelihood be overdrawn." *Id.* at 1222–23 (citation omitted) (internal quotation marks omitted). Finally, the Eight Circuit rejected the argument that the right of equitable subrogation should be subject to Article 9 to provide notice to a contractor's creditors because, as is often the case, the contract funds at issue were never available to those creditors, given the contractor's default. *Id.* at 1223.[7]

We agree that a surety's right to equitable subrogation is not a security interest subject to Article 9 of the UCC. Rather, equitable subrogation is an equitable principle that avoids injustice by allowing a surety to stand in the shoes of another party and assert that party's rights. *Id.* at 1222, 1224; *see also Melrose Gates*, 875 N.W.2d at 817–18. A surety's rights are different from those of a secured creditor, whose rights are limited to those of the debtor. *See* Minn. Stat. § 336.9-203 ("[A] security interest is enforceable against the debtor and third parties . . . only if . . . the debtor has rights in the collateral . . . ."); *see also* U.C.C. § 9-203 cmt. 6 (A.L.I. & Unif. L. Comm'n 2022) ("[T]he baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be.") A surety, on the other hand, is not limited to the defaulting contractor's rights. It is subrogated to the rights of the parties that benefit from its performance, including laborers' and suppliers' rights to be paid, as well as a government entity's right to withhold payment in the event of a contractor's default.

---

[7] We also note that secured lenders, like UPB, may be able to rely on other collateral to mitigate their losses when construction companies default on their loans. In this case, UPB recovered over a million dollars from auctioning off Molnau's equipment and vehicles.

*Pearlman*, 371 U.S. at 141–42; *McHasco*, 141 N.W.2d at 495. Because the right of equitable subrogation is not a security interest under the UCC, it is not subject to the UCC's first-in-time priority rule.

B.

We determine priority to bonded contract funds by the nature of the parties' financial relationships, rather than a first-in-time rule. As we said in *Berggren*:

> [T]he equity of the surety who had been compelled to pay, and had paid, claims against the principal was superior to that of one who loaned money to the contractor to be by him used as he saw fit, either in the performance of his contract or in any other way.

148 N.W. at 56. A lender like UPB has a relationship with only the debtor, and the lender's rights are limited to those of the debtor. *See* Minn. Stat. § 336.9-203; *see also* U.C.C. § 9-203 cmt. 6 (A.L.I. & Unif. L. Comm'n 2022). Sureties, on the other hand, have relationships with the government entities that hold contracts with the principal, and with the lenders and suppliers who file claims against the sureties' bonds.

We applied this reasoning in *First National Bank of Saint Paul v. McHasco Electric, Inc.*, 141 N.W.2d at 491. In that case, a contractor assigned all payments that would come due on a set of bonded contracts to a bank as security for a loan. *Id.* at 493. When the contractor failed to pay laborers and suppliers for the relevant projects, the surety paid their claims according to the bond. *Id.* In deciding that the surety that issued the bond had priority to the bonded contracts, we explained that it was the surety, rather than the contractor, who "render[ed] the necessary performance requisite to compel final payment" of the bonded contracts. *Id.* at 495. By performing "under compulsion of the bond," the

17

surety "became subrogated to the rights of the laborers and materialmen and to the rights of the municipalities to withhold payment to insure completion of the contracts and to pay unpaid laborers and materialmen." *Id.* We held that these rights were superior to the rights of the bank, which derived from the rights of the defaulting contractor.[8] *Id.* at 496.

There are, however, certain circumstances in which we have concluded that a bank has priority over a surety, even if the surety's rights predate the bank's. When a bank acts like a surety in obliging itself to pay for costs that a surety would otherwise be obliged to pay, we have held that the bank has the superior right to reimbursement from contract funds. *New Amsterdam Cas. Co. v. Wurtz*, 177 N.W. 664, 664 (Minn. 1920); *accord Ganley v. City of Pipestone*, 191 N.W. 738, 742 (Minn. 1923). In *Wurtz*, after a surety issued a bond, a contractor agreed to deposit with the bank all the money it had received for constructing a school. 177 N.W. at 664. In exchange, the bank agreed that it would advance any additional money that the contractor needed to pay for labor and materials for the project. *Id.* In that case, we noted that the bank was obligated to advance the necessary funds and did not do so as a mere volunteer. *Id.* at 665–66. Similarly, under the agreement, the contractor was obligated to use any advanced funds for the sole purpose of paying for labor and materials for the school building. *Id.* at 664. In other words, the bank acted like a surety by obligating itself to pay for labor and materials. In determining that the bank

---

[8] This reasoning is consistent with the Restatement position that "[t]o the extent that, through subrogation, the secondary obligor has rights to the obligee's return performance . . . the right of any person claiming an interest in return performance through the principal obligor is subordinate to the secondary obligor's right to that performance." Restatement (Third) of Suretyship & Guar. § 31(2)(b) (A.L.I. 1996).

had priority to the bonded contract funds, we reasoned that by advancing money for the sole purpose of paying for labor and materials, the bank relieved the surety of the obligation it would have had to pay those laborers and suppliers if the contractor had not been able to do so. *Id.* at 665. Under those circumstances, we concluded it would be inequitable for the surety to recoup its losses at the expense of the bank. *Id.*; *accord Ganley*, 191 N.W. at 741–42 (concluding that a lending bank had the superior right to contract funds for the reasons expressed in *Wurtz*).

In *McHasco*, we reaffirmed this exception to the general rule, noting that "the surety prevails unless the bank is previously obligated to advance money for the express purpose of paying for labor and material and the funds advanced are in fact used solely in paying such claims for which the surety would have been liable." 141 N.W.2d at 494. We concluded that the fact that a bank loaned money to a contractor with the "expectation that the proceeds would be used for payment of costs of materials and payroll" associated with a public construction project, and that some of those funds were used for the project, was not enough to make the bank's equity superior to the surety's. *Id.* at 496 ("[T]he equity of the surety through subrogation is superior to the bank even though a substantial part of the loaned funds were used in the performance of the contracts.").

The narrow exception that we identified in *Wurtz* and *Ganley v. City of Pipestone* does not apply in this case. We are not persuaded by UPB's argument that without its loans "there would be no contractor to do the work and therefore no project to bond." We rejected this reasoning in *McHasco*, where there was a stronger showing that some of the loaned funds were actually used on the project at issue. In this case, the funds in dispute

19

would not exist if Granite had not issued the bond required to pay Molnau's laborers and suppliers. *See* Minn. Stat. § 574.26, subd. 2 (requiring a payment and performance bond for all public works projects over a certain dollar amount). Granite paid the claims against the bond, as it was obligated to do under its bond agreements. Therefore, Granite has the right to equitable subrogation, which allows it to assert the rights of the government entities, laborers, and suppliers that benefited from its performance, as well as the contractor itself. UPB has not demonstrated that it possesses a superior equity, as the banks did in *Wurtz* and *Ganley*. In the absence of a superior equity, a performing surety's right to equitable subrogation has priority over a secured creditor as to the bonded contract funds.[9]

## C.

While precedent compels our holding here, we note that there are also significant policy reasons not to apply the UCC's first-in-time priority rule to equitable subrogation in the construction surety context. Applying the first-in-time rule in this context "would undermine the equitable principles on which equitable subrogation is founded." *See U.S. Fid. & Guar. Co. v. APAC–Kan., Inc.*, 151 F. Supp. 2d 1297, 1300 (D. Kan. 2001) (noting no authority requiring that a surety's interest predate another creditor's interest for the surety to have priority under equitable subrogation). Sureties play an important role in Minnesota's statutory scheme for public construction projects. As we have commented,

---

[9] Our decision here is expressly limited to the context of equitable, as opposed to conventional, subrogation. We express no opinion on how a purely contractual right to subrogation would interact with the interests of a secured lender like UPB.

20

surety bonds ensure laborers and suppliers are paid for their work. *See Nelson Roofing & Contracting, Inc. v. C.W. Moore Co.*, 245 N.W.2d 866, 868 (Minn. 1976). Further, surety bonds ensure that public projects are completed and protect government entities from the consequences of a contractor's default. *See* Minn. Stat. § 574.26, subd. 2 (requiring a "performance bond . . . , for the use and benefit of the public body to complete the contract according to its terms, and conditioned on saving the public body harmless from all costs and charges that may accrue on account of completing the specified work").

Performing sureties reasonably expect to be compensated by bonded contract funds. *See Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 954 (8th Cir. 2004) ("[T]he right of . . . the subrogated surety to be paid from funds held by the obligee arises in equity. Sureties bond projects with these rights in mind and with the legitimate expectation that the security ensuring discharge of the underlying obligation will be properly applied."). Applying a first-in-time rule to sureties would alter this expectation and could limit the funds available to sureties when they are called upon to perform under their bonds. This could lead to sureties charging higher premiums or requiring more collateral from contractors, which could limit contractors' access to bonding, given, as amicus curiae Surety and Fidelity Association of America points out, "the tenuous liquidity posture of many contractors." Reduced competition for public works projects could ultimately lead to higher costs for the public.

\*     \*     \*

We conclude that Granite is entitled to summary judgment because its equitable subrogation rights as surety have priority as a matter of law over UPB's rights under the

21

UCC. In the order and judgment directing the receiver to pay the bonded accounts receivable to UPB, the district court contemplated an appeal and potential reversal of the judgment. The district court stated that if the distribution award "is later changed in a subsequent appellate order," then Granite or "another interested party has the right to directly request the proceeds from the party in possession of such proceeds after distribution pursuant to such appellate order." We remand to the district court for entry of judgment in favor of Granite and to permit Granite to request redistribution of the bonded contract funds as contemplated by the district court's order distributing the bonded contract funds to UPB.

## CONCLUSION

For the forgoing reasons, we reverse the decision of the court of appeals and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded.


PROCACCINI, J., took no part in the consideration or decision of this case.